Sherrie ACE, Plaintiff–Appellant–
Cross–Appellee,

v.

**AETNA LIFE INSURANCE COMPANY,**
Defendant–Appellee–Cross–
Appellant.

Nos. 96–35813, 96–36020.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 5, 1997.

Decided March 12, 1998.

As Amended on Partial Grant of
Rehearing May 7, 1998.

Jeffrey Feldman and Susan Orlansky, Young & Feldman, Anchorage, AK; Richard H. Friedman, Jeffrey K. Rubin, Friedman, Rubin & White, Anchorage, AK, for plaintiff–appellant.

Philip Lacovara, New York, NY, for defendant–appellee.

Before: FLETCHER and O'SCANNLAIN, Circuit Judges, and SCHWARZER,* Senior District Judge.

SCHWARZER, Senior District Judge:

Sherrie Ace ("Ace"), a resident of Alaska, sued Aetna Life Insurance Company ("Aet-

* Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

na") in Alaska state court alleging that Aetna acted in bad faith in denying her claim for long-term disability benefits. Aetna removed the case to federal court pursuant to 28 U.S.C. §§ 1332, 1441.

The jury ruled for Ace on her bad faith claim and awarded her $27,009 for the wrongful denial of disability benefits and $100,000 for emotional distress. It also awarded her $16.5 million in punitive damages. The court then granted Aetna's post-trial motion for judgment as a matter of law on punitive damages and for a conditional new trial,[1] but denied its motions for judgment and for a new trial on the bad faith claim. It entered judgment for Ace in the amount of $127,009. Both parties appeal from the adverse rulings on their motions. Aetna also asserts error in the instructions to the jury with respect to emotional distress damages.

We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm in part, reverse in part and remand.

## FACTS

### A. Sherrie Ace's Accident

Ace was employed by the State of Alaska as a senior loan examiner. As a state employee, Ace participated in an Aetna group insurance plan, which provided both short-term and long-term disability benefits. She selected and paid monthly premiums for the maximum available health and disability coverage.

In December 1986, Ace broke her leg in a sledding accident, which completely shattered her knee. Despite multiple surgeries, the condition of Ace's knee deteriorated and she suffered chronic pain in her leg and in her lower back. On April 30, 1992, Ace's orthopedic surgeon, Dr. McEvoy, performed an osteotomy[2] on Ace's knee. Immediately prior to the osteotomy, Ace applied for and received short-term disability benefits from Aetna.

Dr. McEvoy released Ace on a "trial" basis for half-time, light duty work from August 1, anticipating that she would be able to return to full-time by mid-September.[3] Because her pain had worsened, Ace felt unready to return to work and expressed her concerns to Dr. McEvoy. He suggested that she find another doctor. Ace saw a specialist, Dr. Zorn, who informed her that the osteotomy had failed and that she would need a total knee replacement. That operation would have to wait, however, until April 1993 to permit her knee to heal.

### B. Ace's Application for Long–Term Disability Benefits

Ace contacted Aetna and requested a long-term disability benefits application because her short-term disability benefits had expired early in September 1992. Aetna representatives advised her that although her policy required her to be "under the care of a physician," the physician need not be a specialist. Accordingly, Ace had Dr. Kiessling, her long-time family physician, complete Aetna's Attending Physician's Statement ("Statement"). On the form, he diagnosed Ace as suffering from "severe degenerative joint disease," stated that her condition had retrogressed, noted that she experienced "frequent swelling" and "constant pain," and rated her to be between 30–50% and 50–70% physically disabled.[4] Aetna received Ace's application, along with the Statement and Dr. McEvoy's July work release, on October 12, 1992.

On October 20, Aetna returned the Statement to Ace for signature by the physician and asked her to submit a physical capacities evaluation form, which had been prepared by a physical therapist in July.[5] Ace submitted

---

1. At oral argument, Aetna's counsel advised that Aetna had also moved for remittitur of the punitive damage award but that the court had not ruled on its motion.

2. In this procedure, a patient's bones are rebroken and recast in order to shift the patient's weight onto less-damaged parts of the knee.

3. At trial, Dr. McEvoy stated that he referred to the release as "trial" because "[i]t alerts the insurer and the employer and the patient ... that [returning to work] may not work."

4. Aetna's form characterized 30–50% disabled as "Class III ... capable of light work," and 50–70% disabled as "Class IV ... capable of ... sedentary activity."

5. The form indicated that Ace could not work an eight-hour day but predicted that her condition would improve in four to six weeks.

these forms and queried Aetna several times about the status of her claim, indicating her urgent need.

### C. Aetna's First Denial

On November 17, Aetna denied Ace's claim. In the denial letter, Stephen Elliott ("Elliott"), Aetna's account specialist, informed Ace that

> [i]n order to be eligible for Long-term Disability Benefits, you must be totally disabled to the extent that you are unable to work at any gainful occupation due to bodily injury or illness.

He noted that according to the Statement- the most current medical evidence on file-Ace was capable of continuing her employment as a loan examiner because she could perform clerical, sedentary work. Therefore, he wrote, "we cannot consider you as being totally disabled from performing the duties of any gainful occupation as required by the policy," and denied her request for benefits.

Neither Elliott nor any other Aetna employee investigated Ace's claim other than to review the material sent by Ace. Elliott did have the material reviewed by Dr. John Galvin, an Aetna medical consultant, who reported that Ace had not established that she had a long-term disability. But Elliott did not contact Ace's medical care providers or obtain additional medical records, though Ace had signed a release. In determining the physical nature of Ace's occupation, Elliott relied entirely on Aetna's Physical Demands Analysis worksheet, ignored the more complete description that was attached,[6] and did not contact Ace or her supervisor to discuss her job's physical requirements.

6. Aetna's physical demands analysis work sheet described her position as 100% office-based. Ace's supervisor had attached a more complete description, explaining that Ace's position required her to engage in rigorous travel to remote communities.

7. Both parties agree that insurers cannot lawfully apply this standard literally. *See Aetna Life Ins. Co. v. Orr,* 205 Ark. 566, 169 S.W.2d 651, 654 (1943); *Erreca v. Western States Life Ins. Co.,* 19 Cal.2d 388, 121 P.2d 689 (1942).

8. Both Elliott and Southall testified they determined disability based on whether an applicant was capable of earning a monthly amount equal

The "unable to work at any gainful employment" phrase in Elliott's letter is drawn from Aetna's policy. In his deposition, Elliott testified he understood Aetna's policy to require Ace to be "totally disabled from any gainful employment" and "unable to do ... any work," though he added that he would have denied her application even if he believed that Ace could only have worked half-time. Elliott's supervisor, Bryan Southall ("Southall"), testified, however, that he knew Aetna could not apply the "unable to work at any gainful employment" language literally, and that Aetna did not apply it literally in Ace's case.[7] Both he and Elliott testified Aetna applied a "reasonableness" test in evaluating disability.[8] Aetna conceded at trial, however, that no one from Aetna ever told Ace that the policy was not being interpreted and applied literally.[9] Ace testified she had called Aetna several times, but no one would clarify the term "disabled" or suggest specific documents she should send. Based on what she had been told in the letter, she would have to be totally disabled to be eligible for benefits; she knew that her condition was not that bad but also that it did not permit her to perform her job.

### D. Ace's Request for Reconsideration

Ace responded to Aetna's denial by writing a short letter requesting reconsideration.[10] She enclosed a longer letter from Dr. Kiessling, dated November 30, explaining why Ace should be considered totally disabled. Dr. Kiessling's letter noted that Ace's condition had worsened since his earlier Statement, that she now needed "nearly continuous[ ] traction" to obtain any pain relief, that she

to her disability benefits. Ace's benefits equaled 70% of her salary; thus, under their reasonableness test, Ace should have received benefits if she was incapable of working at least 70% of the time at her current job.

9. Aetna's practice was to quote only the language of the policy and not to inform claimants of the legal requirements governing interpretation of the policy or of informal reasonableness guidelines used in evaluating applications.

10. Elliott's November 17 letter had informed Ace that she could appeal his denial but did not specify particular documents or information to send that would be helpful.

had received epidural injections for her back pain, that she could not sit for prolonged periods of time, and that she was unable to perform clerical work. He reclassified her as a "Class V disability," which Aetna's form describes as "severe functional capacity; incapable of minimal (sedentary) activity."

### E. Aetna's Response to the Request for Reconsideration

On December 11, Elliott responded to Ace's request. His letter stated that the information submitted by Ace had been reviewed by Aetna's medical consultant who had advised that "there is no objective medical evidence ... to support your contention that you are unable to work at any gainful occupation." It reiterated that to receive benefits "you must be totally disabled ... from working at any gainful occupation." The letter advised Ace that for Aetna to review her file, Ace would have to have her physicians "furnish ... objective medical evidence to support [her] contention [of total disability]." Aetna's policy neither contains nor defines the term "objective medical evidence," and it did not inform Ace what would qualify as objective medical evidence; its claim handling guidelines, moreover, instruct analysts to consider subjective complaints of pain even in the absence of objective medical findings.[11]

Southall testified that he was uncertain whether Ace's documents contained objective medical evidence and that he would not be surprised if a claimant did not know whether a physician's letter constituted objective or subjective evidence. He stated that what he wanted to see was Dr. Kiessling's chart notes, reports of examinations, and x-rays, but he never asked Ace or Dr. Kiessling to supply these materials.

Aetna's medical consultant, Dr. Galvin, again reviewed Ace's file and concluded there was no medical evidence to support Dr. Kiessling's opinion that Ace was in the Class V disability category. At trial, however, he conceded that Dr. Kiessling's letter contained objective medical evidence and that he was unable to ascertain from Ace's file whether she was disabled.

### F. Ace's Response to Aetna's Second Response

Although Aetna's December 11 letter did not state that the claim had again been denied, it was the functional equivalent of a denial. When Ace received this letter, she had been without income since her short-term disability benefits expired in September and had begun to sell her personal property. She consulted a lawyer, Francine Harbour ("Harbour"), who wrote to Aetna on Ace's behalf "to facilitate the review process in this matter." Harbour's letter stated that Ace believed she already had furnished objective medical evidence but would submit additional information to "clarify any misunderstanding." To that end she requested that Aetna send to her "the pertinent claim adjustment guidelines that [Aetna] relied on in reaching [the] denial determination" and certain other material. She asked Aetna to provide the documents prior to her sending additional information, so that she could ensure that her submission was complete.

Southall responded to Harbour's request on January 28, 1993, stating, "There are no claim adjustment guidelines which we follow." During discovery, however, Aetna produced its "Proper Claim Handling Guidelines" contained in its Methods and Procedures Manual,[12] and at trial Aetna's director of disability claims testified that the guidelines are mandatory for its claim analysts to follow.

### G. Ace's Renewed Request for Reconsideration

On February 12, 1993, Harbour submitted an additional packet of materials to Aetna enclosing another Attending Physician Statement prepared by Dr. Kiessling on January 7, 1993, which rated Ace as a Class V disability, a letter by Dr. Kiessling summarizing the

---

11. Aetna's Proper Claim Handling Guidelines instruct claim analysts to "[c]onsider subjective complaints of the claimant as well as objective evidence" and give as an example "[a] disability claimant [who] genuinely appears to be in pain, although there are no objective medical findings.".

12. See note 11, *supra*.

objective medical evidence upon which he based his opinion and explaining why Dr. McEvoy's July release should not carry dispositive weight,[13] and a physical capacities evaluation ("PCE") completed January 28, 1993. The PCE stated that Ace was capable of sitting, standing or walking for less than an hour each during the day.

Harbour's cover letter explained Ace's fragile physical, emotional and economic position and advised Aetna that unless it accepted Ace's application by March 1, Ace would file suit. By February 1993, Ace had been forced to sell much of her personal property and her home. She sent her eldest son to live with another family and she lived in her car from late February through early April.

### H. Aetna's Response

Southall called Harbour on February 24, 1993, and left a phone message the content of which was disputed at trial. It may have confirmed that the denial of the claim stood or it may have been a request for an independent medical examination ("IME"). In any event, after receiving the additional materials, Dr. Galvin and Southall had concluded that there was insufficient information to support a finding that Ace was disabled. Dr. Galvin considered Dr. Kiessling's letter as being of "no value" because of its tone, and asserted that he "[did] not accept Dr. K's opinion, he is not a specialist and we are not providing a social benefit service." Southall testified that he discounted Dr. Kiessling's letter because it was unaccompanied by Dr. Kiessling's chart notes, examination results or other materials. Neither Southall nor Dr. Galvin contacted Dr. Kiessling to discuss his letter or to ask him to submit materials to support his conclusions.

### I. Aetna's Demand for an Independent Medical Examination

On March 4 Aetna wrote Ace a letter, directing her to appear before a designated physician for an IME on April 5, 1993. On advice of counsel, Ace refused to appear. On March 15, Aetna wrote to Harbour, reaffirm-

ing its decision to deny the claim on the basis of Ace's failure to produce proof of "[t]otal disability [which] is the inability to work at any gainful occupation due to sickness or injury." Ace then retained litigation counsel who attempted, unsuccessfully, to reschedule the IME.

### J. End of Ace's Disability

On April 8, 1993, Ace's previously-scheduled knee surgery was performed. Dr. Zorn successfully replaced Ace's knee. Within two months, Ace was walking without crutches and returned to work. Her disability ended June 1, 1993.

## DISCUSSION

### 1. Judgment as a Matter of Law–Punitive Damages

Judgment as a matter of law is appropriate only when the evidence, "viewed in the light most favorable to the nonmoving party," could not reasonably support the verdict. *Amarel v. Connell,* 102 F.3d 1494, 1517–18 (9th Cir.1997), (as amended). We review the grant of a motion for judgment as a matter of law *de novo. Id.* at 1517.

 To support punitive damages under Alaska law, a plaintiff must prove by clear and convincing evidence that the wrongdoer's conduct "was outrageous, such as acts done with malice or bad motives or reckless indifference to the interests of another person." Alaska Stat. § 09.17.020;[14] *State Farm Fire & Cas. Co. v. Nicholson,* 777 P.2d 1152, 1158 (Alaska 1989) (quoting *Sturm, Ruger & Co. v. Day,* 594 P.2d 38, 46 (Alaska 1979), *modified on reh'g,* 615 P.2d 621 (Alaska 1980), *overruled on other grounds by Dura Corp. v. Harned,* 703 P.2d 396 (Alaska 1985)). Alaska courts will overturn a punitive damage award only if consideration of the record as a whole leaves them with a firm conviction of error and the need to intervene to prevent a miscarriage of justice. *Alaskan Village, Inc. v. Smalley,* 720 P.2d 945, 948 (Alaska 1986).

The district court concluded that no reasonable jury could find by clear and convinc-

---

**13.** In his letter, Dr. Kiessling stated that, "Dr. McEvoy's release ignored the slower than anticipated healing and associated pain of the osteotomy procedure ... as well as the critically complicating feature of her low back pain."

**14.** The statute was amended in August 1997 to make minor textual changes not significant to the decision of this case.

ing evidence that Aetna acted with malice, bad motives or reckless indifference. After determining that the evidence did not support a finding of malice or bad motive, the court held that the evidence did not clearly and convincingly support a finding of reckless disregard, stating:

> A jury could find that by requiring the insured to marshall [sic] all the information, especially after Dr. Kiessling's second opinion was communicated, it is more likely than not that Aetna acted with enough disregard for Ace's interest to represent bad faith sufficient to breach the contract ... but the evidence cannot support a finding that Aetna's disregard for Ace's interest was clearly and convincingly reckless to the point that Aetna should be punished. Plainly put, there is nothing outrageous about relying on the opinion of the most knowledgeable physician, Dr. McEvoy, to the exclusion of what little contrary indication of Ace's condition had emerged prior to asking for an IME, the one procedure that could be expected to clear up any uncertainty.

■ In ruling that while Aetna acted "with enough disregard for Ace's interest to represent bad faith" but not "clearly and convincingly reckless[ly]," the district court ignored significant and undisputed evidence. Focusing only on Aetna's "requiring the insured to marshall all the information" and "relying on the opinion of the most knowledgeable physician," the court failed to take into account substantial evidence [15] from which a jury could reasonably have found, clearly and convincingly, that Aetna acted with reckless in-

difference to Ace's interests.[16] That evidence, which is summarized in the preceding part of this opinion and is undisputed, includes the following conduct by Aetna: (1) basing denial of the claim on an illegal standard for benefit eligibility; [17] (2) failing to inform the claimant of the standard actually used by Aetna in evaluating disability claims; [18] (3) failing to investigate the claim and to seek or request the supporting information alleged to be missing; (4) failing to assist the claimant in presenting her disability claim; [19] (5) relying on outdated prognoses of the claimant's expected recovery and disregarding recent reports of her actual condition; (6) denying her claim based on an undefined "requirement" not a term of her policy and contrary to Aetna's internal claim adjustment guidelines; (7) falsely advising the claimant that Aetna had no claim adjustment guidelines; and (8) making a last-minute demand for an IME after having denied the claim.

In evaluating the sufficiency of the evidence, the district court failed to consider it as a whole and to resolve all inferences in favor of the jury's verdict. *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962) ("In cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."). Viewing the evidence in the light most favorable to the nonmoving party, we cannot say the evidence does not reasonably support an award of punitive damages.[20]

---

**15.** The court also failed to take into account that Aetna had effectively twice denied the application before it asked for the IME; had it wished to "clear up any uncertainty," it would presumably have asked for the examination before it decided whether to grant or deny the application.

**16.** Because under Alaska law, the jury could award punitive damages on evidence that Aetna acted with reckless indifference to Ace's interests, it is not necessary to address the court's findings with respect to malice and bad motives.

**17.** See note 7, *supra.*

**18.** Alaska law requires the insurance company to provide a reasonable explanation of the basis in the policy for denial of a claim. Alaska Stat. §§ 21.36.125(1) and (14).

**19.** Alaska law requires an insurer upon receipt of notice of a claim, promptly to provide the necessary claim forms, instructions and assistance so that the claimant is able to comply with all reasonable requirements. Alaska Admin. Code tit. 3, § 26.040(a)(3) (1997).

**20.** The two cases on which the district court relied, *State Farm Mut. Auto. Ins. Co. v. Weiford,* 831 P.2d 1264 (Alaska 1992), and *Nicholson,* 777 P.2d 1152, are inapposite. Both involved negotiations leading to disputes between the insured and the carrier over the amount to be paid on the insured's damage claim, the court holding that the evidence did not support a finding of "outrageous" conduct. Neither involved denial of coverage or benefits or other misconduct by the carrier.

## 2. Conditional Grant of New Trial—Punitive Damages

We have jurisdiction to review the conditional grant of a new trial order under Fed. R.Civ.P. 50(c)(1). *Air–Sea Forwarders, Inc. v. Air Asia Co.,* 880 F.2d 176, 190 n. 15 (9th Cir.1989). The district court's order stated in relevant part:

> In general the court agrees with the arguments advanced by defendant and therefore grants the motion for a new trial as to the claim for punitive damages such that if the court of appeals should reverse this court's decision on the punitive damages claim there will be a new trial on that claim.

■ Rule 50(c)(1) states that the court "shall specify the grounds for granting the motion for the new trial." The court failed to do so here, at least explicitly, but it is a fair inference that it granted a new trial for the same reasons for which it granted judgment as a matter of law. The court's failure to rule on Aetna's request for a remittitur or to base its new trial order specifically on the magnitude of the punitive damage award, as opposed to the fact of the award, leads us to the conclusion that the new trial was granted on the erroneous ground that the evidence was insufficient as a matter of law. While our review of an order granting a new trial is for abuse of discretion, "a stringent standard applies when the motion is based on insufficiency of the evidence." *EEOC v. Pape Lift, Inc.,* 115 F.3d 676, 680 (9th Cir.1997) (internal quotations omitted) (quoting *Venegas v. Wagner,* 831 F.2d 1514, 1519 (9th Cir.1987)). A district court may order a new trial based on insufficient evidence only if it finds that the jury's verdict "is against the great weight of the evidence, or it is quite clear that the jury has reached a seriously erroneous result." *Id.; Roy v. Volkswagen of Am., Inc.,* 896 F.2d 1174 (9th Cir.), *as amended by* 920 F.2d 618 (9th Cir.1990). The court made no such finding and the record would not support it.

Rule 50(c)(1) further provides that where "the motion for a new trial has been conditionally granted and the judgment is reversed on appeal, the new trial shall proceed unless the appellate court has otherwise ordered." The rule contemplates that in a case such as this, we may give direction for further proceedings. *See* 28 U.S.C. § 2106 ("any [ ] court of appellate jurisdiction may ... remand the cause and direct the entry of such ... order ... as may be just under the circumstances").

■ While the evidence was sufficient as a matter of law to support an award of punitive damages, whether the award was excessive is a different issue.[21]

> A punitive damage award is excessive if it is manifestly unreasonable, resulting from passion or prejudice or disregard of the rules of law. Relevant factors include the compensatory damage amount, magnitude of the offense, importance of the policy violated and the defendant's wealth.

*Alaskan Village,* 720 P.2d at 949; *see also Sturm, Ruger & Co.,* 594 P.2d at 48; *Pluid v. B.K.,* 948 P.2d 981, 983 (Alaska 1997) (per curiam). No single factor is dispositive. *Sturm, Ruger & Co.,* 615 P.2d at 624 & n. 3. The award must also pass muster under federal due process analysis. *BMW v. Gore,* 517 U.S. 559, 575–87, 116 S.Ct. 1589, 1599–1604, 134 L.Ed.2d 809 (1996) (identifying as "guideposts" that must be considered: (1) "degree of reprehensibility of the defendant's conduct"; (2) "ratio [of punitive damage award] to the actual harm inflicted on the plaintiff"; and (3) "[c]omparing the punitive damage award and the civil or criminal penalties that could be imposed for comparable misconduct").

■ Our review of the reported Alaska decisions leads us to the conclusion that the punitive damage award was excessive. Although not dispositive itself, the ratio of punitive-to-compensatory damages—130 to 1— is far beyond any approved by Alaska courts.[22] Moreover, the amount of punitive

---

**21.** Aetna does not contend that the award was the product of passion or prejudice.

**22.** *See Pluid,* 948 P.2d at 984, 986 (upholding jury's 5-to-1 ratio of punitive to compensatory damages); *Day,* 615 P.2d at 624 (remitting jury punitive damage award, resulting in a 3.6-to-1 ratio); *Alaska Ins. Co. v. Movin' On Constr. Inc.,*

718 P.2d 472, 475 (Alaska 1986) (upholding 3-to-1 ratio); *Teamsters Local 959 v. Wells,* 749 P.2d 349, 361 n. 26 (Alaska 1988) (upholding 2.54-to-1 ratio); *Ben Lomond, Inc. v. Campbell,* 691 P.2d 1042, 1048 (Alaska 1984) (upholding 2.38-to-1 ratio); *Alaskan Village,* 720 P.2d at 949 (upholding 2-to-1 ratio). *Cf. Cameron v. Beard,* 864 P.2d 538, 551 (Alaska 1994) (uphold-

damages far exceeds the potential civil and criminal penalties for Aetna's actions.[23] Accordingly, we remand with directions to the district court to enter an order denying a new trial on punitive damages conditioned on Ace accepting a remittitur of punitive damages in an amount to be determined by the district court.

### 3. Denial of Aetna's Motion for Judgment–Bad Faith Liability

The district court's denial of Aetna's motion may be reversed only if the evidence, construed in the light most favorable to Ace, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury's. *Acosta v. City & County of San Francisco*, 83 F.3d 1143, 1145 (9th Cir.), *cert. denied sub nom., Yawczak v. Acosta*, —— U.S. ——, 117 S.Ct. 514, 136 L.Ed.2d 403 (1996). We review *de novo* the denial of a motion for judgment as a matter of law. *Id.*

 To prove bad faith, a plaintiff must establish "the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *Hillman v. Nationwide Mut. Fire Ins. Co.*, 855 P.2d 1321, 1324 (Alaska 1993) (quoting *Anderson v. Continental Ins. Co.*, 85 Wis.2d 675, 271 N.W.2d 368, 376–77 (1978)). As the foregoing discussion shows, the court's denial of judgment as a matter of law is supported by the evidence that (1) Aetna did not investigate Ace's claim and shifted the burden of investigating entirely to her;[24] (2) Aetna did not gather any medical records, contact Ace's lawyers, or telephone Ace or her employer to obtain evidence relevant to her claim; (3) Aetna failed to disclose the standard it was obliged to use in evaluating a disability claim; (4) Aetna failed to provide a reasonable explana-

tion for its denial of Ace's claim; (5) Aetna acted unreasonably in reviewing Ace's records by relying on outdated prognoses of her expected recovery and ignoring more recent reports on her actual condition; (6) Aetna failed to answer Ace's questions and to tell her what documents to submit in support of her claim; and (7) Aetna knew that Ace suffered from a chronic condition that had been predicted to deteriorate.

The foregoing discussion also disposes of Aetna's appeal from the denial of a new trial on its bad faith liability.

### 4. Denial of Aetna's Motion for New Trial on the Award of "Emotional Distress" Damages

Aetna appeals the denial of a new trial on the award of "emotional distress" damages, asserting that the district court erred by failing to instruct the jury that a plaintiff seeking emotional distress damages must prove that her distress was "severe" before any damages may be awarded. We review the denial of a new trial for abuse of discretion. *Wharf v. Burlington N. R.R. Co.*, 60 F.3d 631, 637 (9th Cir.1995). We hold that the district court did not abuse its discretion in denying Aetna's motion for a new trial.

 Under Alaska law, breach of the implied covenant of good faith and fair dealing is actionable in tort against insurers. *Nicholson*, 777 P.2d 1152. Emotional distress is a category of damages in a bad faith case but is not an element of the claim. Alaska courts have never explicitly limited recovery of emotional distress damages in bad faith insurance cases to those instances where the plaintiff has shown "severe" emotional distress. However, Aetna interprets *Chizmar v. Mackie*, 896 P.2d 196 (Alaska 1995), a negligent infliction of emotional dis-

---

ing 70–to–1 and 45–to–1 ratios). In *Cameron,* however, in addition to the $1,000 in compensatory damages received from each of the two individual defendants, the plaintiff also recovered $700,000 in actual damages from the State, another defendant. *Id.* at 544. Thus, the overall ratio of punitive to compensatory damages was 1–to–6.

**23.** The maximum fine under the applicable provisions of the Alaska criminal code is $500,000.

Alaska Stat. §§ 11.46.600(a)(2), 12.55.035(c)(1)(A).

**24.** Aetna's claim handling guidelines instruct claims handlers to: "Obtain all available pertinent facts, not just those that are favorable to the company. Develop the claimant's case as well as the company's. If he is being treated by different doctors, obtain medical information from all of them."

tress case, as requiring plaintiffs seeking emotional distress damages from any type of tort to prove that their distress was "severe" before any damages may be awarded.[25]

 Aetna's reliance on *Chizmar* is misplaced. The requirement that the damages be "severe" is an element of the underlying torts of negligent and intentional infliction of emotional distress, but not of the tort of breach of the duty of good faith and fair dealing by an insurer to an insured. *Chizmar*, 896 P.2d at 204 (negligent infliction); *Cameron v. Beard*, 864 P.2d 538, 548 (Alaska 1993) (intentional infliction). Aetna contends that the elements of the two torts, intentional infliction of emotional distress[26] and bad faith breach, are so similar that any attempt to distinguish them would be artificial. The argument overlooks the fact that Alaska courts have treated intentional infliction of emotional distress and bad faith breach cases differently. For instance, under Alaska law, a plaintiff cannot sustain a claim for intentional infliction of emotional distress unless the defendant's conduct rises to the level of outrageousness, which would warrant a punitive damage award. *Hawks v. Department of Pub. Safety*, 908 P.2d 1013, 1015 (Alaska 1995) (citing *Richardson v. Fairbanks N. Star Borough*, 705 P.2d 454, 456 (Alaska 1985)). However, a plaintiff may successfully bring a bad faith breach claim and recover compensatory damages where the evidence was insufficient to support an award of punitive damages because it did not show that the insurer's actions were outrageous or reckless. *Nicholson*, 777 P.2d at 1158; *Weiford*, 831 P.2d at 1267.

Moreover, the policy considerations for requiring severity to be shown do not support applying the requirement to bad faith insurance cases. As the court said in *Chizmar*, "The basic assumption underlying the tradi-

tional rule is that emotional distress without physical injury is relatively trivial and easily feigned." *Chizmar*, 896 P.2d at 201. In contrast, when an insurance company wrongly refuses to honor its obligations, emotional distress is a natural and believable response. Insureds bargained and paid for the security and peace of mind of knowing that reimbursement and financial support will be provided in the event that a misfortune occurs. As insurance payments often serve as a safety net for the insured, Aetna's refusal to cover Ace's injury is foreseeably egregious.

The fact that the Alaska courts have applied the tort of bad faith breach only to insurance contracts between the insurer and the insured further demonstrates that these policy considerations do not come into play. *See Nicholson*, 777 P.2d at 1157. By allowing insureds to bring the action in tort, Alaska courts have relieved plaintiffs of the obligation of bringing a separate tort claim for negligent or intentional infliction of emotional distress. However, unlike a plaintiff in an insurance case, a plaintiff bringing a claim for bad faith breach of an employment contract would have to independently establish the tort of negligent or intentional infliction of emotional distress to recover emotional distress damages. *See, e.g., ARCO Alaska, Inc. v. Akers*, 753 P.2d 1150, 1153–54 (Alaska 1988) (no independent tort for breach of good faith and fair dealing in an employment contract).

## CONCLUSION

We AFFIRM the denial of Aetna's motions for judgment as a matter of law on bad faith liability, for a new trial on bad faith liability and for a new trial on emotional distress damages. We REVERSE the grant of judgment as a matter of law on punitive damages

---

**25.** Aetna also relies on *Hillman*, 855 P.2d at 1324. *Hillman* cites a Wisconsin case, *Anderson*, 271 N.W.2d at 376–77, which required severe emotional distress, but uses the case to explain the objective and subjective elements of bad faith. The *Hillman* court did not address the severity of the emotional distress damages that must be proved or cite to the *Anderson* court's discussion of this issue. The fact that the court relied on one portion of the *Anderson* opinion does not support the claim that it also adopted other parts of the opinion.

**26.** Under Alaska law, a claim for intentional infliction of emotional distress has three elements: (1) the defendant's conduct is extreme and outrageous; (2) the conduct is intentional or reckless; and (3) the conduct causes severe emotional distress. *Bishop v. Municipality of Anchorage*, 899 P.2d 149, 155 (Alaska 1995) (citing *King v. Brooks*, 788 P.2d 707, 711 (Alaska 1990)).

and we VACATE the conditional grant of a new trial on punitive damages. We RE-MAND with direction to enter an order denying Aetna's motion for new trial on punitive damages on condition that Ace accepts a remittitur of punitive damages in an amount to be determined by the district court.

Costs on appeal shall be awarded to Ace pursuant to Fed.R.App.P. 39(a).