**Sherrie ACE, Plaintiff,**

v.

**AETNA LIFE INSURANCE CO., Defendant.**

**No. J94–0018 CV (JWS).**

United States District Court,
D. Alaska.

March 29, 1999.

Jeffrey M. Feldman, Feldman & Orlansky, Anchorage, AK, Jeffrey K. Rubin, Friedman Rubin & White, Anchorage, AK, for plaintiff.

Anthony M. Sholty, Faulkner Banfield et al, Juneau, AK, Douglas G. Houser, Bullivant Houser Bailey, Portland, OR, for defendant.

### ORDER FROM CHAMBERS

### [Re: Motion on Remand Addressing Remittitur, Dockets 273 and 276]

SEDWICK, District Judge.

#### I. INTRODUCTION

At docket 273, defendant Aetna Life Insurance Co. ("Aetna") files its memorandum addressing the issue of remittitur. Plaintiff Sherrie Ace ("Ace") files her memorandum at docket 276. The court issued a preliminary order at docket 291 on February 23, 1999, in which the court analyzed the relevant legal principles and facts and set forth its tentative conclusion. Oral argument was heard on March 19, 1999. This order sets out the court's final decision respecting remittitur.

#### II. BACKGROUND

This is an insurance bad faith case governed by Alaska law. After a lengthy trial, the jury awarded Ace $27,009 for wrongful denial of nine months of long-term disability benefits, and $100,000 for emotional distress. The jury also awarded Ace punitive damages of $16.5 million. Aetna filed a post-trial motion for judgment as a matter of law regarding its liability for punitive damages. This court concluded there was insufficient evidence

to support an award of punitive damages and, therefore, vacated the award. Ace appealed. The Ninth Circuit agreed that $16.5 million was an excessive award, but concluded there was sufficient evidence to support imposition of punitive damages.[1] The appellate court initially concluded that punitive damages should be awarded in the amount of $381,000, but, on reconsideration, remanded the case with directions to deny a new trial on punitive damages conditioned on Ace accepting a remittitur of punitive damages in an amount to be determined by this court. Ace and Aetna filed their respective memoranda on remand. Aetna argues remittitur should be ordered so that punitive damages are reduced to an amount "substantially less than $250,000."[2] Ace contends remittitur should be ordered reducing the award of punitive damages to $9 million.[3]

#### III. DISCUSSION

 Under Alaska law, a plaintiff must establish by clear and convincing evidence that a defendant acted with malice, bad faith, or reckless indifference in order to support an award of punitive damages.[4] The court may order remittitur if a punitive damage award is manifestly unreasonable.[5] In determining whether a punitive damage award is excessive, relevant factors include the amount awarded for compensatory damages, the magnitude of the offense, the importance of the policy violated, and the defendant's wealth.[6] No one factor is dispositive. The court must also consider due process concerns embodied in the United States Constitution.[7] The amount on remittitur should be the maximum that a jury could have awarded which would not be excessive.[8] In determining

---

1. *Ace v. Aetna Life Ins. Co.,* 139 F.3d 1241, 1248–49 (9th Cir .), *cert. denied,* —— U.S. ——, 119 S.Ct. 338, 142 L.Ed.2d 279 (1998).

2. Docket 273 at 4.

3. Docket 276 at 2.

4. AS 09.17.020.

5. *Alaskan Village, Inc. v. Smalley,* 720 P.2d 945, 949 (Alaska 1986).

6. *Id.*

7. *BMW v. Gore,* 517 U.S. 559, 575–87, 116 S.Ct. 1589, 1599–1604, 134 L.Ed.2d 809 (1996).

8. *Exxon Corp. v. Alvey,* 690 P.2d 733, 742 (Alaska 1984).

remittitur, the court should construe the evidence in the light most favorable to the plaintiff.[9]

## A. Amount Awarded for Compensatory Damages

██ Compensatory damages totaled $127,009. The jury awarded punitive damages in the amount of $16.5 million. This represents a ratio of approximately 130:1. The Alaska Supreme Court has eschewed rigid formulae for determining an award of punitive damages. Punitive damages need not "bear a specific ratio to actual damages."[10] The court has therefore "refused to prescribe a definite ratio between compensatory and punitive damages."[11] However, damage ratios in reported Alaska decisions have been in the range of 5:1 or less, with higher ratios in rare cases. For example, in *Teamsters Local 959 v. Wells*,[12] the ratio of punitive to compensatory damages was less than 3:1 in a case involving death threats and related violence perpetrated against a union member by his union.[13] The amount of punitive damages was $300,000. In *Alaskan Village Inc. v. Smalley*,[14] the ratio of punitive to compensatory damages was 2:1 in a case involving a child mauled by a pit bull.[15] The amount of punitive damages was $550,000. In *Pluid v. B.K.*,[16] the ratio of punitive to compensatory damages was 5:1 in a case involving a child who was sexually assaulted repeatedly. The amount of punitive damages was $185,000. The decision in *Cummings v. Sea Lion Corp.*[17] reflects that a jury awarded compensatory damages of $650,000 while awarding punitive damages of only $106,000, a ratio of substantially less than 1:1, based upon fiduciary fraud. In *Great Western Savings Bank v. George W. Easley, Co.*,[18] the jury also awarded punitive damages which were less than compensatory damages. Compensatory damages were $367,711, while punitive damages awarded for misleading Easley so that it would complete certain construction work were $83,300. The ratio of punitive to compensatory damages was significantly less than 1:1.

In its most recent decision on the topic, *International Bhd. of Elec. Workers, Local 1547 v. Alaska Utility Const., Inc.*,[19] the Alaska Supreme Court affirmed an order of remittitur by the trial court which reduced an award of punitive damages to $212,500, an amount which was 18 times larger than the amount of compensatory damages awarded by the trial jury. In that case, the punitive damages were awarded for conduct which included death threats against the plaintiff's employees. In *Norcon, Inc. v. Kotowski*,[20] another recent decision, the Alaska court ordered remittitur from over $3 million to $500,000 in a case involving sexual harassment and intentional infliction of emotional distress. The ratio between punitive and compensatory damages was approximately 48:1.

At oral argument, Ace noted that in several of the cases cited by this court in its tentative order, the Alaska Supreme Court simply affirmed punitive damages awards. As Ace correctly observed, the ratio found in such decisions reflects what a particular jury awarded, but does not establish the maximum amount that a jury could award which would not be excessive.

9. *Norcon, Inc. v. Kotowski*, 971 P.2d 158, 161 (Alaska 1999).

10. *Clary Ins. Agency v. Doyle*, 620 P.2d 194, 205 (Alaska 1980).

11. *Cameron v. Beard*, 864 P.2d 538, 551 (Alaska 1993).

12. 749 P.2d 349 (Alaska 1988).

13. 749 P.2d at 361 n. 26.

14. 720 P.2d 945 (Alaska 1986).

15. 720 P.2d at 949.

16. 948 P.2d 981, 983 (Alaska 1997).

17. 924 P.2d 1011, 1016 (Alaska 1996).

18. 778 P.2d 569, 571 (Alaska 1989).

19. 976 P.2d 852, 853 (Alaska 1999).

20. 971 P.2d 158, 176 (Alaska 1999).

Moreover, the recent decisions in *IBEW* and *Norcon* do indicate that when the issue is the maximum amount which may be awarded, a ratio significantly in excess of 5:1 may result.

### B. *Magnitude of the Offensive Conduct*

When granting Aetna post-trial relief, this court concluded there was no clear and convincing evidence of malicious conduct or bad faith on Aetna's part, nor was there clear and convincing evidence that Aetna acted with reckless disregard for Ace. Reversing this court, the Ninth Circuit held that liability for punitive damages could be based on Aetna's reckless indifference. The appellate court specifically declined to address this court's findings regarding malice and bad faith.[21] It follows that this court's earlier finding that Aetna did not act maliciously remains the law of the case. Moreover, as the summary of evidence below shows, there is no clear and convincing evidence that Aetna did act maliciously.

Ace worked as a senior loan examiner for the State of Alaska. Ace injured herself in a severe sledding accident in December 1986. Her knee was badly damaged and caused her pain and difficulty for years after the sledding accident. Finally, Ace underwent knee surgery in April 1992. Her orthopedic surgeon released her to work part-time in July 1992 on a light duty status. Ace applied for and received short-term disability ("STD") benefits from Aetna. Ace's surgeon assumed Ace would be fully recovered by September 1992. Unfortunately, Ace's condition did not improve. Ace's family physician completed an attending physician's statement to submit to Aetna for long-term disability ("LTD") benefits. Ace's family physician

rated Ace as being between 30–50 percent and 50–70 percent physically disabled. Aetna classified a 30–50 percent disability as being capable of light work. Aetna classified a 50–70 percent disability as being capable of sedentary activity.

In October 1992, Ace submitted her claim for LTD benefits. Her claim was accompanied by medical records from her orthopedist and family physician noted above. Aetna's claim adjuster reviewed Ace's file. The file suggested Ace could perform all aspects of her job, which Aetna understood to be essentially clerical in nature. However, Aetna did not independently investigate the essential functions of Ace's job to evaluate what she was and was not expected to do as a loan examiner. The claims adjuster therefore tentatively concluded Ace's claim should be denied. Before making a final decision, the file was forwarded to a medical doctor working for Aetna who independently evaluated Ace's file and concluded that her claim should be denied. The decision to deny coverage was communicated to Ace on November 17, 1992. Ace then requested reconsideration, but did not submit any medical records or other information. Aetna requested medical records or some documentation to clarify the medical opinions of Ace's orthopedist and family physician. Ace submitted a letter dated November 30, 1992, from her family physician. Aetna's claim adjuster again reevaluated the file and passed it along to his supervisor. This supervisor examined the file and resubmitted it to the same doctor who had previously reviewed the file who concluded there was no objectively verifiable evidence supporting the new opinion from Ace's family physician. Aetna's consulting doctor therefore concluded there was still insufficient evidence to show that Ace was disabled and recommended denial.[22] Aet-

---

21. *Ace, supra*, 139 F.3d at 1247 n. 16.

22. The consulting physician, Dr. Galvin, did make a comment to the effect that Aetna was not running a social welfare program. Ace seizes upon this remark as adequate to support a finding of malice. The court disagrees. This single remark taken in context shows

that Dr. Galvin was unsympathetic, perhaps hard-hearted, but even drawing all inferences in favor of Ace, neither his remark nor the remark taken together with all the other evidence can support a finding by clear and convincing evidence that Aetna acted with malice toward Ace.

na advised Ace of its decision on December 11, 1992, but left the door open for further review. Ace retained a lawyer. Ace's lawyer asked Aetna for a copy of its policies or guidelines for reviewing claims. Aetna responded that there were no claim adjustment guidelines which Aetna followed. In fact, trial testimony confirmed that Aetna did have manuals establishing claim handling guidelines.

Ace's lawyer wrote to Aetna on February 12, 1993. Ace's lawyer submitted another opinion from Ace's family physician which confirmed his November 30, 1992, opinion and more particularly described the objective basis for his conclusions. This third opinion was dated January 7, 1993. It is unclear why Ace waited over a month to transmit this third opinion to Aetna. Regardless, Aetna again evaluated Ace's file, and again reached the same conclusions it had previously reached. In March 1993, Aetna suggested Ace agree to an independent medical examination ("IME"). Ace refused to submit to an IME. Ace had successful knee replacement surgery completed in April 1993. Ace returned to work on June 1, 1993.

Ace was without income for nine months; from September 1992, when her STD benefits expired, until June 1993, when she returned to work. Because her claim for LTD benefits was denied, she was forced to sell much of her property and her home. Ace lived in her car from late February 1993 through early April 1993, a period of about one month. Ace sent her son to live with another family.

The Ninth Circuit concluded Aetna was recklessly indifferent in at least eight separate ways. The court found Aetna: (1) based denial of Ace's LTD claim on an illegal standard for benefit eligibility; (2) failed to inform Ace of the standard actually used to evaluate disability claims; (3) failed to investigate the claim; (4) failed to assist Ace present her disability claim; (5) relied on outdated prognoses of Ace's condition and disregarded revised reports ad-dressing her physical disability; (6) denied Ace's claim contrary to Aetna's own internal claim adjustment guidelines; (7) falsely told Ace Aetna had no claim adjustment guidelines; and (8) demanded Ace submit to an IME after having already denied Ace's claim.[23]

Unwarranted, false or fraudulent disability claims are submitted to insurers. The need to insist that claims for disability be adequately established does not, of course, excuse reckless indifference to the interests of the insured, but it does afford perspective. Moreover, Ace suffered no long-term physical harm as a result of Aetna's reckless indifference. Aetna denied nine months worth of LTD insurance benefits valued at $27,009. The jury valued Ace's emotional suffering at $100,000. Although the Ninth Circuit held that Aetna's claim adjuster based denial of Ace's claim on an illegal standard despite the adjuster's testimony that it was not used, Aetna conceded during this litigation that "insurers cannot lawfully apply this standard literally." [24]

At oral argument, Ace argued that even if Aetna did not act maliciously, there are instances in which one person's reckless indifference is more serious than another's malicious act, because the potential for harm is greater. Of course, this is true, but it does not eliminate the principle that an act done with malice is more reprehensible than an act which is reckless. Although reckless indifference is outrageous enough to warrant imposition of punitive damages, it remains different in kind from malicious misconduct.

In sum, the magnitude of Aetna's offensive conduct is significant. However, it is not as serious as the conduct reflected in those Alaska cases in which punitive damages were awarded for death threats, intentional torts, sexual harassment by a supervisor, pit bull maulings, and repeated sexual assaults.

---

**23.** *Ace, supra,* 139 F.3d at 1247.

**24.** *Ace, supra,* 139 F.3d at 1244 n. 7.

### C. The Importance of the Policy Violated

■ Insurers are charged with a fiduciary relationship towards their insureds.[25] Public confidence in the insurance industry is an important policy goal recognized by the Alaska Supreme Court.[26] Nevertheless, the policy is not to be exalted above all other considerations. The Alaska Supreme Court has vacated decisions awarding punitive damages against insurers, even while it affirmed verdicts finding the insurers acted in bad faith,[27] much as this court did here.

The Alaska legislature also recognizes the public interest in fair claims handling by insurers. However, the legislature has set limits on civil fines which may be imposed against insurers for unfair claim practices which are sharply lower than the punitive damages awarded by the jury in this case. Civil fines for violation of the Unfair Claims Practices Act range from $2,500 to $250,000, depending upon the circumstances of each case.[28]

By way of analogy, it may be noted that labor unions are also charged with special duties and responsibilities regarding their members. Yet, in *Teamsters Local 959 v. Wells*, where the union egregiously violated its duties, punitive damages were awarded in the amount of $300,000.[29]

### D. Aetna's Wealth

The defendant's wealth is considered for the purposes of deterrence and punishment.[30] Moreover, it is undisputed that Aetna's wealth is very substantial. Ace has rather aptly summarized the role which Aetna's wealth should play:

> In short, while Aetna's wealth does not in itself justify a large punitive award, Aetna's wealth cannot be forgotten; it is a factor this court *must* consider in applying Alaska law to select an award sufficient to achieve the legitimate goals of punitive damages but not legally or constitutionally excessive.[31]

### 1. Deterrence

■ To support the proposition that a $9 million award is necessary to deter Aetna, Ace cites a 1987 Alabama case[32] awarding punitive damages against Aetna in the amount of $500,000. That case arose out of a denial of insurance benefits which occurred in November 1977, some 15 years before Aetna denied Ace's claim in November of 1992. Ace cites a second reported decision decided in 1979 in which punitive damages were awarded against Aetna for failure to pay insurance benefits in 1976, some 16 years before Ace's claim was denied.[33] Even assuming that it is proper to consider these cases when the jury was not apprised of them, they reflect conduct too stale to be of value in measuring the degree to which Aetna's current corporate culture might be inclined to mistreat Aetna's insureds.

---

**25.** *O.K. Lumber Co. v. Providence Washington Ins. Co.*, 759 P.2d 523, 525 (Alaska 1988).

**26.** *Clary Ins. Agency v. Doyle*, 620 P.2d 194, 205 (Alaska 1980).

**27.** *State Farm Mut. Ins. Auto. Co. v. Weiford*, 831 P.2d 1264, 1266–69 (Alaska 1992); *State Farm Fire and Cas. Co. v. Nicholson*, 777 P.2d 1152, 1158 (Alaska 1989).

**28.** AS 21.36.320(d)(e). At oral argument, Ace contended that appropriate civil penalties could range up to $1 million. However, as noted by Aetna, penalties in the range of $1 million are only permissible where an insurer violates a cease and desist order. AS 21.36.320(f).

**29.** *Wells, supra,* 749 P.2d at 353, 361 n. 26.

**30.** *Sturm, Ruger & Co. v. Day*, 594 P.2d 38, 47–48 (Alaska 1979), *overruled on other grounds, Dura Corp. v. Harned,* 703 P.2d 396, 405 n. 5 (Alaska 1985); *see also* A. Mitchell Polinsky and Steven Shavell, "Punitive Damages: An Economic Analysis," 111 Harv. L.Rev. 870, 873 n. 5 (1998).

**31.** Docket 276 at p. 36.

**32.** *Aetna Life Ins. Co. v. Lavoie*, 505 So.2d 1050 (Ala.1987).

**33.** *Phillips v. Aetna Life Ins. Co.*, 473 F.Supp. 984 (D.Vt.1979).

Ace also filed a copy of a state trial court order upholding an award of punitive damages in another bad faith case at docket 283. The order was issued January 13, 1999, in *Fisher v. Aetna Life Ins. Co.*[34] The Fisher jury awarded the plaintiff $292,000 in compensatory damages and $8,400,000 in punitive damages. Aetna's actions supporting that jury's verdict do suggest a significant need for deterrence. However, this court cannot properly rely on *Fisher* for that proposition. *Fisher* was not presented to the Ace jury, nor could it have been, because it represents a post-trial development. It is necessary to remember that this court is not now substituting its own judgment (which might be influenced to some extent by existence of the conduct underlying *Fisher*) for that of the trial jury. Rather, this court is now charged to determine the highest non-excessive level of punitive damages which the Ace jury itself could have awarded. It may be added that, if undisturbed on appeal, the *Fisher* decision will provide the very deterrence Ace demands.

At oral argument, Ace urged that Aetna's lack of contrition justifies a large award of punitive damages. In the court's view, remorse or contrition are states of mind which bear upon the need for deterrence. One who is contrite or remorseful requires less deterrence than one who is not. However, the actions to which Ace points to show lack of remorse or contrition is conduct arising subsequent to the jury's verdict. So, like the conduct reflected in *Fisher*, even if Aetna's post-trial conduct shows something more than the exercise of Aetna's rights as a litigant, that conduct cannot be used to determine what the jury should have done, because it is something which the jury could not have known.

### 2. *Punishment*

■ Punitive damages are intended in part to punish the wrongdoer. The Alaska legislature has not prescribed a criminal penalty for the kind of conduct which gives rise to the need to punish Aetna, but it has provided civil penalties for the violation of AS 21.36. That chapter of the Alaska Statutes contains a prohibition on actions very much akin to those which the Ninth Circuit has said give rise to Aetna's liability for punitive damages.[35] The fine for a single violation of the relevant statutory scheme is ordinarily $2,500, but a maximum civil fine which may be imposed for knowingly engaging in a general business practice in violation of a provision of AS 21.[36] is $250,000.36 Although various impediments to the enforcement of AS 21.36.125 may render it inappropriate to rely on the existence of the statutory provision to deter and punish all who violate the standards set, it is appropriate to consider the quantum of punishment which the legislature has attached to the proscribed conduct.

### 3. *Other Considerations*

■ The record does not show how much of Aetna's wealth is attributable to its activities in Alaska. Heavy reliance on a defendant's aggregate wealth would be inappropriate. Some tempering of the weight given that criterion is necessary where it cannot be adjusted to reflect that which is necessary to protect the interests of each individual state's consumers.[37] As Justice Stevens noted in the *BMW* case:

> The fact that BMW is a large corporation rather than an impecunious individual does not diminish its entitlement to fair notice of the demands that the several States impose on the conduct of its

---

**34.** *Fisher v. Aetna Life Ins. Co.*, 3AN–97–291 Civ., Order January 13, 1999, at 5.

**35.** AS 21.36.125. *Compare,* AS 21.36.125(2) – (7) and (12) with the list of points which the Ninth Circuit held give rise to Aetna's liability at 139 F.3d 1247.

**36.** At oral argument, Ace asserted that the maximum civil penalty is $1· million, not $250,000. However, the larger penalty applies only where an insurer has violated a cease and desist order. AS 21.36.320(f).

**37.** *BMW, supra,* 517 U.S. at 571–74, 585, 116 S.Ct. at 1596–98, 1604.

business. Indeed, its status as an active participant in the national economy implicates the federal interest in preventing individual States from imposing undue burdens on interstate commerce. While each State has ample power to protect its own consumers, none may use the punitive damages deterrent as a means of imposing its regulatory policies on the entire Nation.[38]

Insofar as deterrence is concerned, Alaska has no authority to "impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States."[39] While the court does not imply that what Aetna did to Ace would be lawful in other states, the court reads the *BMW* case broadly enough to suggest that Alaska must leave some room within which the other states can exercise their own interests in defining the precise extent of and in deterring wrongful conduct.

With respect to punishment, the effect of awarding punitive damages based on wealth generated from Aetna's operations outside Alaska raises serious questions regarding the legitimate extent of Alaska's interest in punishing Aetna. If it is assumed that Aetna's behavior in other jurisdictions warrants punishment, just as the incident in Alaska warrants punishment, then it is the other jurisdictions whose citizens have been injured which have an interest in imposing punishment commensurate with the activities inside their borders. On the other hand, if it is assumed that Aetna has not engaged in similarly blameworthy activity in other jurisdictions, there is even less justification for imposing a penalty whose size is established on the basis of the wealth created from activities outside Alaska, for they were not culpable.

The considerations discussed in this section counsel a more limited reliance on Aetna's total wealth than would be the case if the defendant were principally operating in Alaska.

### E. *Additional Factors*

In *Norcon, Inc. v. Kotowski*,[40] the Alaska Supreme Court recently examined issues concerning remittitur. Kotowski filed suit for sexual harassment, negligent infliction of emotional distress, and intentional infliction of emotional distress. The jury found in Kotowski's favor and awarded compensatory damages in the amount of $10,344.40. The jury awarded punitive damages in the amount of $3,770,260.63. This represented a ratio of over 360:1 between punitive and compensatory damages. Norcon appealed, arguing in part that the punitive damages award was excessive. In assessing the punitive damages award, the Alaska court relied primarily on its own prior jurisprudence, but also considered all nine factors identified by the Model Punitive Damages Act to determine whether an award of punitive damages was excessive or not. These nine factors are:

> (1) the nature of the defendant's wrongful conduct and its effect on the claimant and others;
>
> (2) the amount of compensatory damages;
>
> (3) any fines, penalties, damages, or restitution paid or to be paid by the defendant arising from the wrongful conduct;
>
> (4) the defendant's present and future financial condition and the effect of an award on each condition;
>
> (5) any profit or gain, obtained by the defendant through the wrongful conduct, in excess of that likely to be divested by this and any other actions against the defendant for compensatory damages or restitution;
>
> (6) any adverse effect of the award on innocent persons;

---

38. *BMW, supra,* 517 U.S. at 585, 116 S.Ct. at 1604.

39. *BMW, supra,* 517 U.S. at 572, 116 S.Ct. at 1597.

40. 971 P.2d 158 (Alaska 1999).

(7) any remedial measures taken or not taken by the defendant since the wrongful conduct;

(8) compliance or noncompliance with any applicable standard promulgated by a governmental or other generally recognized agency or organization whose function is to establish standards; and

(9) any other aggravating or mitigating factors relevant to the amount of the award.[41]

Applying its customary analysis aided by consideration of these nine factors, the *Norcon* court held the award was excessive. The court ordered remittitur to $500,000, which represented a ratio of approximately 48:1 between punitive and compensatory damages.

In the preceding sections this court has addressed most of the nine factors as fully as the record permits. A few additional comments may be added. With respect to factor (3), it appears that no fine or penalty has been imposed on Aetna, so any award of punitive damages need not be adjusted to reflect such a prior punishment.

■ Concerning factor (5), the extent of the actual gain to Aetna from its treatment of Ace was the sum of $27,009,[42] a sum which is not in excess of that "likely to be divested by this action ... against the defendant for compensatory damages or restitution." However, at oral argument, Ace argued that Aetna's potential gain was much more than its actual gain. The court agrees that probable potential gain, rather than actual gain, should be considered. Ace argues that her LTD benefits could have been owed and paid indefinitely, and certainly for a longer period than nine months. The probable gain to Aetna should be derived from the information available when Aetna was processing her claim. The initial reports submitted by Ace's own doctors suggested Ace's

injury was not going to produce a disability of extended duration. Aetna never completely foreclosed the possibility that Ace's claim would be approved, and Ace's rejection of an IME might reasonably have appeared to signal her belief that her disability would not continue much longer as, indeed, it did not. Given the initial reports prepared by Ace's own doctors, and Ace's refusal of the IME, the probable potential gain to Aetna could not reasonably be estimated as an endless stream of LTD payments. LTD payment extending over a period ranging from a few months to, at most, a few years would have appeared probable. Anything more would have been speculative.

Ace has also argued that Aetna benefited by avoiding a proper investigation. Aetna responded by saying that it eventually did acquire the necessary information. Aetna's response misses Ace's point which is that by improperly tasking the insured with securing information, Aetna saved itself effort and money. Moreover, this is precisely the sort of gain which is highly unlikely to ever be divested by any insured's action for compensatory damages or restitution.

All things considered, the probable gain to Aetna was in excess of the $27,009 awarded to Ace by the jury. This fact warrants a higher award of punitive damages than would be the case were the gain recoverable as compensatory damages.

There is not much information bearing on factor (7). What little there is consists of the fact that Aetna has acknowledged that it could not lawfully apply the disability standard which the Ninth Circuit held it did use in evaluating Ace's claim.[43]

## F. Federal Due Process Concerns

The fourteenth amendment to the United States Constitution is interpreted as

---

41. *Norcon, supra,* 971 P.2d at 176 (*quoting* Model Punitive Damages Act (U.L.A.) § 7(a)).

42. Aetna gained nothing from Ace's emotional distress which the jury valued at $100,000.

43. *Ace,* 139 F.3d at 1244, n. 7.

prohibiting states from "imposing a 'grossly excessive' punishment [on] a tortfeasor."[44] In *BMW v. Gore*,[45] the United States Supreme Court identified three factors to consider: (1) the "degree of reprehensibility of the defendant's conduct"; (2) the "ratio [of punitive damage award] to the actual harm inflicted on the plaintiff"; and (3) the comparison between "the punitive damage award and the civil or criminal penalties that could be imposed for comparable misconduct."[46] There is a fourth consideration: as suggested in the section above discussing Aetna's wealth, due process and comity concerns counsel restraint where a proposed award of punitive damages is based to a significant degree on an accumulation of wealth generated outside the jurisdiction where the wrong was suffered.

### 1. *Degree of Reprehensibility*

Aetna acted with reckless indifference to a person to whom it owed a special duty as her insurer. Aetna did not act with malice. Ace endured a very stressful nine months including one particularly trying month living in her car in March of 1993. Ace suffered no permanent injury as a result of Aetna's conduct. The degree of reprehensibility is moderate.

### 2. *Ratio of Punitive Damages to Actual Harm*

Ace argues $9 million would be an appropriate amount to award on remittitur. This represents a ratio of approximately 71:1 of punitive to compensatory damages. The court finds this amount clearly excessive. The actual harm Ace suffered was loss of benefits contractually due in the amount of $27,009 and emotional distress in the amount of $100,000. Considering all of the factors surrounding this case, being familiar with the trial record, and having surveyed Alaska case law, the court finds that a more appropriate ratio would be no more than 5:1. However, given that under

Alaska law the award must be the maximum which would not be excessive, and given the decisions in *IBEW* and *Norcon*, an award which represents a higher ratio is permissible.

At oral argument, Aetna contended that anything exceeding a ratio in the range of 3:1 or exceeding an award of $500,000 would represent an unprecedented award. Reported Alaska cases establish a range of typical punitive damage awards which is not inconsistent with Aetna's arguments. However, the task at hand is not to make a typical punitive damage award, but to ascertain the highest punitive damage award which would not be excessive.

### 3. *Comparison of Civil or Criminal Penalties*

Under Alaska law, the maximum civil fine for actions such as those in which Aetna engaged is $250,000.[47] There is no criminal penalty directly on point.

### 4. *Reliance on Defendant's Wealth*

■ Ace's arguments for a $9 million award are rooted in her view of the facts which holds that Aetna's wealth is so great that such a large award is necessary to deter and punish Aetna. However, for the reasons discussed in section D.3 above, the proper extent of an Alaska court's use of punitive damages to deter and to punish must be assessed with some regard for the scope of the defendant's activities within Alaska's borders rather than with an exclusive emphasis on economic accomplishment resulting largely from activities which take place in other states. This does not mean that Aetna's aggregate wealth is irrelevant, but it does mean it deserves far less emphasis than Ace would give it.

### IV. *CONCLUSION*

For the foregoing reasons, this court finds that the maximum amount that a

**44.** *BMW, supra,* 517 U.S. at 568, 116 S.Ct. at 1592.

**45.** 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

**46.** *BMW, supra,* 517 U.S. at 575–87, 116 S.Ct. at 1599–1604.

**47.** AS 21.36.320(e).

jury could have awarded which would not be excessive under state law and the fourteenth amendment is $950,000. The court therefore holds that an appropriate remittitur of punitive damages in this case is $15,550,000 of the original $16,500,000.

A remitted award of $950,000 is almost four times larger than the $250,000 civil fine to which Aetna could have been subjected. Although the amount is greater than the available civil fine, the case law does not treat the maximum statutory penalty as a ceiling on punitive damage awards, but rather as one of several factors to be considered. Nevertheless, the relationship of the remitted award to the $250,000 civil penalty, and particularly to the $1 million maximum penalty which could be imposed for similar conduct only after a cease and desist order had been entered, suggests that the $950,000 remitted award approaches the upper limit of what representative democracy in Alaska deems the maximum appropriate punishment for conduct like that in which Aetna engaged.

A remitted award of $950,000 represents a ratio of punitive damages to compensatory damages of 7.5:1. That ratio is half again more than the highest ratio this court finds typical of jury awards, a condition which reflects that the court's task is to find the highest reasonable award, not a typical award. On the other hand, 7.5:1 is a ratio significantly below those reflected in *IBEW* and *Norcon,* cases which specifically addressed remittiturs, but which also involved either death threats or the intentional infliction of emotional distress and sexual harassment—conduct which is more reprehensible than Aetna's reckless acts in processing Ace's claim.

Ace shall have twenty (20) days from the date of this order to file a notice with the court advising whether Ace consents to accept the above remittitur. If she accepts, Ace should lodge a proposed form of judgment, and judgment will be entered accordingly. If Ace declines to accept remittitur, the parties shall confer and within forty (40) days from the date of this order file a joint notice setting out what pre-trial activities either party believes must be concluded prior to trial and a proposed schedule for the completion of all such activities.

If Ace rejects remittitur set out above, a second trial will be conducted limited to determining punitive damages. However, it appears that virtually all the evidence presented in the first trial would be relevant to the punitive damages issue, so the trial would not likely be significantly shorter. At a second trial the court will give more detailed instructions on punitive damages than were given at the first trial, and those instructions will reflect many of the considerations discussed in this order. Thus, the court is optimistic that a third trial would not ever become necessary.