**STATE FARM FIRE & CASUALTY COMPANY, Appellant,**

**v.**

**David G. NICHOLSON and Doreen C. Nicholson, husband and wife, Appellees.**

**No. S-2303.**

Supreme Court of Alaska.

July 21, 1989.

Rehearing Denied Aug. 24, 1989.

Kenneth P. Jacobus, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, for appellant.

Ralph B. Cushman, Anchorage, for appellees.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

David and Noreen Nicholson sued State Farm Fire & Casualty Company for unreasonably and willfully breaching its duty to act in good faith. The Nicholsons alleged that State Farm did not promptly settle a claim under their homeowner's policy. The jury returned a special verdict in favor of the Nicholsons, awarding $105,700 in compensatory damages and $7,500 in punitive damages. On appeal, we address whether the breach of the implied covenant of good faith and fair dealing in "first-party" insurance cases is a tort, thereby possibly justifying an award of punitive damages, and whether the award of prejudgment interest was appropriate.

### I.

In 1981, the Nicholsons purchased homeowner's insurance from State Farm, covering their residence at 1841 Early View Drive in Anchorage. In the event the Nicholsons suffered a loss that was covered, the policy obligated State Farm "to place the insured back in the situation they were in prior to the loss."

In February, 1983 a water main belonging to Central Alaska Utilities, Inc. broke. The water main was buried eight feet underground and ran beside the Nicholson house and other houses in the subdivision. The escaping water caused the soil underneath the house to erode and settle. More than a year later, on March 27, 1984, the Nicholsons first contacted State Farm to report the loss. On April 6, 1984 Vere Hotchkiss, claims adjuster for State Farm, made an initial on-premise inspection, and returned again on April 11, 1984 with an engineer to conduct another inspection. Relying on the Franklin & Allen engineering report issued on April 13, 1984, which stated two possibilities for the loss i.e. water alone or permafrost and earth settling, State Farm denied coverage on April 22, 1984, because its policy contained an exclusion for broad water damage and damage caused by earth movement. Furthermore, the Franklin & Allen report recommended that the Nicholson house be observed dur-

ing the winter of 1984–1985 to determine if any more settling would occur. Another consulting engineering report agreed with the Franklin & Allen report that a problem with the Nicholson house was permafrost degradation.

In the meantime, State Farm agreed to cover the Nicholsons' next door neighbor for the same loss. On June 14, 1984 State Farm now agreed to extend coverage to the Nicholsons for their loss and requested them to obtain property appraisals. On August 15, 1984 a general contractor J.B. White, Inc. inspected the premises and declined to give a repair estimate to the Nicholsons until a soil survey was performed. In September 1984, Shannon & Wilson drilled two test holes and issued two reports to the Nicholsons on October 23 and December 3, 1984. During the winter of 1985 engineers took perimeter levels around the house twice a month until March 11, 1985. During this time the Nicholsons experienced electrical and structural problems in their house. They were upset with the delay in fixing their house.

On May 29, 1985, a new State Farm adjuster, Roberta Halcro contacted the Nicholsons and requested they contact David Chapman of Pac–Rim Construction Services to provide an estimate for the repair of the house by either demolition or replacement. The Pac–Rim repair report was issued on June 14, 1985 and both repair estimates exceeded $163,000, well in excess of the policy limits of $113,264.

State Farm then obtained an appraisal of the property with improvements as of September 24, 1985 for $98,200, and offered to pay that amount plus additional reimbursement for repair or replacement costs up to the policy limits. The offer was made on October 9, 1985. The Nicholsons rejected this offer and filed suit against State Farm on October 17, 1985.[1]

At trial in March 1987, State Farm offered testimony from several witnesses that the adjustment of this claim was highly unusual, difficult, and complex. The Nicholsons offered testimony from Robert Lowe, as an expert independent claim adjuster, that State Farm's delay in deciding coverage and settlement of the claim was unreasonable and outrageous.

## II.

State Farm argues that the tort of bad faith handling of insurance claims should only be recognized in the context of liability claims, also known as third-party claims,[2] and not in first-party cases, in which an insured seeks coverage for losses he or she incurred.[3] The Nicholsons argue that Alaska should recognize the tort of bad faith in first-party as well as third-party cases.

The tort of bad faith in the insurance context can be traced to the covenant of good faith and fair dealing, a contractual duty implied in all insurance policies. W. Shernoff, *supra* note 1, § 2.01. Jurisdic-

1. In the October 9, 1985 letter State Farm requested (1) that the Nicholsons within 60 days submit a sworn statement of proof of loss; and (2) informed the Nicholsons that they are entitled to replacement or repair cost up to the policy limits of $113,264. The Nicholsons' attorney, Ralph Cushman, made a counteroffer (1) that State Farm pay close to the policy limits, and waive subrogation rights; or (2) pay something in the $170,000 range, and pursue subrogation with the insureds. State Farm rejected these counteroffers.

2. Third-party cases involve an insurance company satisfying a claim against the insured by a third party. W. Shernoff, S. Gage & H. Levine, *Insurance Bad Faith Litigation* § 3.01, at 3–3 (1987) [hereinafter W. Shernoff].

3. Jury Instruction 16 indicates that the superior court treated the breach of the implied covenant of bad faith and fair dealing as a tort. Jury Instruction 16 stated:

> Every contract imposes upon each party a duty of good faith and fair dealing in its performance or its enforcement.
>
> An insurance company which intentionally deals in bad faith with its insured by refusing unreasonably to pay the insured for a valid claim, or settle a valid claim, covered by the policy may be found liable in tort for damages which proximately result from such conduct. Bad faith does not mean bad judgment or negligence, but means having a dishonest purpose through some motive of self-interest or ill will, or having maliciousness or hostile feelings toward its insureds, or acting with reckless indifference to the interests or rights of its insureds.

tions differ in their treatment of a breach of the implied covenant of good faith and fair dealing in the insurance context. Some jurisdictions characterize the cause of action as merely a breach of contract; others characterize the cause of action as a tort in third-party cases but not first-party cases; still others characterize the cause of action as a tort in both first-party and third-party cases. *Id.* §§ 2.01–2.02 (and cases cited therein); *see also* 15A R. Anderson, *Couch Cyclopedia of Insurance Law* § 58.3 (1983).

Courts first recognized the tort of bad faith in third-party cases. W. Shernoff, *supra* note 1, § 1.07[2], at 1–24 to 1–25. The California Supreme Court was the first to apply the tort of bad faith to first-party cases. *See Gruenberg v. Aetna Ins. Co.*, 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032 (1973). In *Gruenberg,* after fire damaged the insured's restaurant, the insured sought to recover his loss pursuant to a fire policy. After the insurer denied liability under the policy, the insured sued for the tort of bad faith. The court extended its prior holdings, which recognized the tort of bad faith in third-party cases,[4] to the first-party case before it. *Id.*, 108 Cal. Rptr. at 485–86, 510 P.2d at 1037–38. The court reasoned that, in third-party cases,

> we considered the duty of the insurer to act in good faith and fairly in handling the claims of third persons against the insured, described as a "duty to accept reasonable settlements"; in the case before us we consider the duty of an insurer to act in good faith and fairly in handling the claim of an insured, namely a duty not to withhold unreasonably payments due under a policy. These are merely two different aspects of the same duty. That responsibility is not the requirement mandated by the terms of the policy itself—to defend, settle, or pay. It is the obligation, deemed to be imposed by the law, under which the insurer must act fairly and in good faith in discharging its contractual responsibilities. Where in so doing, it fails to deal *fairly and in good faith* with its insured by refusing, without proper cause, to compensate its insured for a loss covered by the policy, such conduct may give rise to a cause of action in tort for breach of an implied covenant of good faith and fair dealing.

*Id.* at 1037 (emphasis in original).

Since *Gruenberg,* a great number of other jurisdictions have recognized the tort of bad faith in first-party cases.[5]

In *Noble v. National American Life Insurance Co.*, 128 Ariz. 188, 624 P.2d 866, 867–68 (Ariz.1981), the Arizona Supreme Court, in following *Gruenberg,* noted:

> We are persuaded that there are sound reasons for recognizing the rule announced in *Gruenberg.* The special nature of an insurance contract has been recognized by courts and legislatures for many years.... An insurance policy is not obtained for commercial advantage; it is obtained as protection against calamity. In securing the reasonable expectations of the insured under the insurance policy there is usually an unequal bargaining position between the insured and the insurance company.... Often the insured is in an especially vulnerable economic position when such a casualty loss occurs. The whole purpose of insurance is defeated if an insurance company can refuse or fail, without justification, to pay a valid claim. We have determined that it is reasonable to conclude that there is a legal duty implied in an insurance contract that the insurance company must act in good faith in dealing with its insured on a claim, and a violation of that duty of good faith is a tort.

(Citations omitted).[6] In *White v. Unigard Mutual Insurance Co.*, 112 Idaho 94, 730

4. *See generally Crisci v. Security Ins. Co.*, 66 Cal.2d 425, 58 Cal.Rptr. 13, 426 P.2d 173 (1967); *Comunale v. Traders & Gen. Ins. Co.*, 50 Cal.2d 654, 328 P.2d 198 (1958) (tort of bad faith recognized in third-party cases).

5. *See Spencer v. Aetna Life & Cas. Ins. Co.*, 227 Kan. 914, 611 P.2d 149, 151–52 (1980) (listing jurisdictions which have adopted *Gruenberg*); Kornblum, *The Current State of Bad Faith and Punitive Damage Litigation in the U.S.*, 23 Tort & Ins.L.J. 812, 824–27 (1988).

6. As one commentator has noted:

P.2d 1014 (1986), the Idaho Supreme Court raised an additional policy justification for holding that the breach of the covenant of good faith and fair dealing sounds in tort:

> An action in tort provides a remedy for harm done to insureds though no breach of an express contractual covenant has occurred and where contract damages fail to adequately compensate insureds.... [T]he requirement that contract damages be foreseeable at the time of contracting, in some cases would bar recovery for damages proximately caused by the insurer's bad faith. The measurement of recoverable damages in tort is not limited to those foreseeable at the time of the tortious act; rather they include "[a] reasonable amount which will compensate plaintiff for *all* actual detriment proximately caused by the defendant's wrongful conduct."

*Id.*, 730 P.2d at 1017–18 (citations omitted). The Texas Supreme Court discussed both justifications in its decision to recognize a common-law cause of action for breach of the duty of good faith and fair dealing:

> In the insurance context a special relationship arises out of the parties' unequal bargaining power and the nature of insurance contracts which would allow unscrupulous insurers to take advantage of their insured's misfortunes in bargaining for settlement or resolution of claims. In addition, without such a cause of action insurers can arbitrarily deny coverage and delay payment of a claim with no more penalty than interest on the amount owed. An insurance company has exclusive control over the evaluation, processing and denial of claims.

*Arnold v. National County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex.1987).

In the past, we have declined to recognize a common-law tort duty of good faith and fair dealing in other contexts. For example, in *O.K. Lumber Co. v. Providence Washington Insurance Co.*, 759 P.2d 523 (Alaska 1988), an injured claimant sued a third-party tortfeasor's insurer for failure to promptly settle a claim. We declined to recognize a common-law tort duty of good faith and fair dealing running from an insurer to an injured claimant absent a contractual relationship. However, the decision in *O.K. Lumber* is not controlling in the instant appeal because there is a contractual relationship between State Farm and the Nicholsons: the Nicholsons are both the insureds and the injured claimants.

In *ARCO Alaska, Inc. v. Akers*, 753 P.2d 1150, 1153–54 (Alaska 1988), we ruled that an employer's breach of the duty of good faith and fair dealing implied in an employment contract is a breach of contract which does not constitute an independent tort. However, employment contracts are substantially different from insurance contracts. Therefore, we do not extend *Akers* to the insurance context.

■ We hold that, in the first-party context, an insured's cause of action against an insurer for breach of the duty of good faith and fair dealing sounds in tort. The special relationship between the insured and insurer in the insurance context justifies this result.[7] State Farm contends that such a holding turns every breach of a

[A] related concern is the expectation of the insurance-consuming public which the industry has fostered itself. Allstate's slogan "You're in Good Hands," Travelers' motto of protection "Under the Umbrella," and Fireman's Fund symbolic protection beneath the "Fireman's Hat," exemplify the industry's own efforts to portray itself as a repository of the public trust. But with the public trust may be visited responsibility for a violation of such trust as evidenced by recent recognition of extra-contractual "rights" of insureds or tortious responsibility of insurers beyond the four corners of its insuring agreement—particulary in the first-party area.

McMains, *Bad Faith Claims Handling—New Frontiers: A Multi-state Cause of Action in Search of a Home,* 53 J. Air L. & Com. 901, 904 (1988). It is noteworthy that the insurance company involved in this appeal promotes itself in national advertisements with the slogan, "Like a good neighbor, State Farm is there."

7. We reject the holding of *Santilli v. State Farm Insurance Co.*, 278 Or. 53, 562 P.2d 965, 969 (1977), that the justifications supporting third-party actions do not support first-party actions. The *Santilli* court ignores the insurer's unequal bargaining power as to the insured's claim and the insurer's interest in delaying payment in order to obtain a settlement.

commercial contract into a tort cause of action. We disagree. As commentators have noted:

> The adhesionary aspects of the insurance contract, including the lack of bargaining strength of the insured, the contract's standardized terms, the motivation of the insured for entering into the transaction and the nature of the service for which the contract is executed, distinguish this contract from most other non-insurance commercial contracts. These features characteristic of the insurance contract make it particularly susceptible to public policy considerations.

Louderback & Jurika, *Standards for Limiting the Tort of Bad Faith Breach of Contract,* 16 U.S.F.L.Rev. 187, 200–01 (1982) (footnotes omitted).

The availability of a tort action for breach of the duty of good faith and fair dealing will provide needed incentive to insurers to honor their implied covenant to their insureds. We reject the argument that the statutory scheme regulating the insurance industry provides sufficient incentive to insurers.[8] *See* AS 21.36.010–21.-36.420. As the Idaho Supreme Court noted in *White,*[9] the State has limited means with which to police the insurance industry. Furthermore, the statutory remedies fail to compensate the insured for damages involved in the insurer's bad faith denial of coverage. *See* AS 21.36.320(d), (e); *O.K. Lumber,* 759 P.2d at 526–27.

In conclusion, we hold that the trial court did not err in instructing the jury that an insurer's bad faith failure to settle a first-party claim is a tort.

III.

Since State Farm's wrongful acts constituted a tort, punitive damages were also possible. The jury awarded the Nicholsons $7,500 in punitive damages. State Farm argues that the Alaska Insurance Code preempts any punitive damages claims in first-party actions. We disagree. State Farm relies on the preemption provisions in AS 21.03.060 and the civil penalty provisions for unfair trade practices. *See* AS 21.36.320; 21.90.020. The preemption provision cited by State Farm involves political subdivisions of the state and in no way addresses the issue of damages against insurance companies in civil actions.[10] The civil penalties provisions involve unfair or deceptive practices prohibited by the code. AS 21.36.320.

Under AS 21.36.125, entitled "Unfair claims settlement practices," an insurance company only violates the chapter if it engages in certain proscribed acts "with such frequency as to indicate a practice." AS 21.36.125. Therefore, the potential $25,000 fine referred to by State Farm thus is not applicable unless the insurer is committing the unfair claim settlement practice with considerable "frequency." The civil penalty under AS 21.90.020 is also inapplicable absent "frequent" violations of the insurance code. At most, the Director of Insurance may impose a $1,000 penalty for an isolated act prohibited under the code. AS 21.36.320(c), (d).

As the court of appeals noted in *Hugo v. City of Fairbanks,* 658 P.2d 155, 161 (Alaska App.1983):

> Statutes or ordinances that establish rights or exact penalties that are in derogation of the common law are construed in a manner that effects the least change possible in the common law. If a statute is intended to change the common law, then "the legislative purpose to do so must be clearly and plainly expressed."

Given the limited scope and civil penalties provided by the Alaska Insurance Code, we conclude that the legislature did not intend

8. *See, e.g., Spencer,* 611 P.2d at 158.

9. *White,* 730 P.2d at 1019 n. 3.

10. AS 21.03.060 reads in full:

> The state hereby pre-empts the field of regulating insurers and their general agents, agents and representatives. All political subdivisions of the state, including home rule boroughs or cities, are prohibited from requiring of an insurer, general agent, agent or representative regulated under this title an authorization, permit or registration of any kind for conducting transactions lawful under the authority granted by the state under this title.

to alter a private party's right to seek punitive damages.

Next, State Farm contends that the evidence does not support an award of punitive damages. To support punitive damages, the wrongdoer's conduct must be "outrageous, such as acts done with malice or bad motives or reckless indifference to the interests of another." *Sturm, Ruger & Co., Inc., v. Day,* 594 P.2d 38, 46 (Alaska 1979), *overruled on other grounds, Dura Corp. v. Harned,* 703 P.2d 396 (Alaska 1985).

Based upon the factual scenario set forth above in section I, as well as our review of the entire record, we conclude there was insufficient evidence as a matter of law to support a finding of outrageous conduct or a gross deviation from an acceptable standard of reasonable conduct in order to sustain an award of punitive damages. Thus, the trial court erred in instructing the jury on the punitive damages issue. *See Alyeska Pipeline Serv. Co. v. O'Kelley,* 645 P.2d 767, 773–74 (Alaska 1982).

IV.

The jury returned a verdict for the Nicholsons in the amount of $105,700 in compensatory damages. In its final judgment, the superior court ordered State Farm to pay prejudgment interest on the $105,700. State Farm argues that the estimates upon which the jury relied in setting the compensatory damage award were current at trial, and that the trial judge should not have added prejudgment interest to that portion of the damage award.

We discussed the issue of prejudgment interest in *Farnsworth v. Steiner,* 638 P.2d 181, 183–85 (Alaska 1981).[11] The rationale behind awarding prejudgment interest is that "judgment creditors are entitled to the time value of the compensation for their injuries [which is] recognized by this court in *all* civil cases." *Farnsworth,* 638 P.2d at 184. We categorized prejudgment interest as a "consequential injury" and held that it was "compensation and not a cost of litigation." *Id.* Since prejudgment interest is an item of compensatory damages,

> [an] insurer will not be liable for prejudgment interest in excess of the applicable damage limitation[;] the insurer will be liable for any prejudgment interest which, when added to damages rendered against the insured, does not exceed the limitation on liability.

*Guin v. Ha,* 591 P.2d 1281, 1287 (Alaska 1979); *see also American Nat'l Watermattress Corp. v. Manville,* 642 P.2d 1330, 1343 (Alaska 1982). Prejudgment interest should be denied "in only the most unusual case," such as double recovery. *Id.*

State Farm relies on the decision in *Sebring v. Colver,* 649 P.2d 932 (Alaska 1982), in which we discussed one situation when prejudgment interest was inappropriate. In *Sebring,* the jury returned a verdict of $54,000 in compensatory damages, $42,000 of which represented the cost of future repairs. *Id.* at 936. The trial court awarded prejudgment interest on the entire $54,000. Based on the fact that "the probable basis for the jury award was the estimated cost of repairs at the time of trial," *id.,* we held that prejudgment interest should not have been awarded on that portion of damages representing the cost of future repairs. We reasoned:

> Since the financial impact of the passage of time was thus incorporated into the jury's damage award, any award of prejudgment interest on this amount would therefore constitute a double recovery.

*Id.*

State Farm misconstrues the decision in *Sebring* insofar as it contends that prejudgment interest is inappropriate as a matter of law when repair estimates are current at the time of trial. *Sebring* stands for the simple principle that prejudgment interest is not available when such an award would constitute a double recovery. In the instant case, there is no such danger; therefore, *Sebring* does not preclude an award of prejudgment interest.

State Farm also argues that the superior court erred by awarding prejudg-

11. *See also Morris v. Morris,* 724 P.2d 527, 529 (Alaska 1986).

ment interest because its policy states that the insured is not entitled to payment until thirty days after a final judgment is entered.

We disagree. In *Davis v. Criterion Insurance Co.*, 754 P.2d 1331, 1332 (Alaska 1988), we ruled that an insurer who wrongfully denies coverage has materially breached the contract and may not require its insured to comply with other terms of the policy. In the instant case, the jury found that State Farm should have made a settlement offer in April 1985. Its failure to do so constitutes a material breach of contract. Therefore, we conclude that State Farm may not enforce the policy provision to defeat the Nicholsons' right to collect prejudgment interest on the damage award.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.