# THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 43802

JOEL W. HARMON and KATHLEEN F. HARMON, husband and wife, )
)
Plaintiffs-Appellants, )
)
v. )
)
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, )
)
Defendant-Respondent. )
_____ )

Boise, January 2017 Term

2017 Opinion No. 43

Filed: May 11, 2017

Stephen W. Kenyon, Clerk

Appeal from the District Court of the First Judicial District of the State of Idaho, Kootenai County. Hon. Cynthia K.C. Meyer, District Judge.

The order of the district court is <u>reversed in part</u>, and the case is <u>remanded</u>.

Bistline Law, PLLC, Coeur d'Alene, for appellants. Arthur M. Bistline argued.

Elam & Burke, P.A. Boise, for respondent. Jeffrey A. Thomson argued.

_____

BRODY, Justice.

Plaintiffs Joel W. Harmon and Kathleen F. Harmon filed a claim with their insurance company, State Farm Mutual Automobile Insurance Co., after their motorhome was broken into and damaged. The Harmons subsequently brought suit against State Farm in district court, claiming that State Farm breached the insurance agreement by failing to pay the amount required to actually repair the vehicle or pay the cash value. The Harmons also brought a claim for bad faith. State Farm moved for summary judgment on both claims, which the district court granted. The Harmons timely appealed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Harmons owned a 2008 National Pacifica motorhome. They lived in the motorhome in Alaska. The Harmons spent the fall of 2013 in the lower 48 states. In December 2013, they

1

placed the motorhome in storage at a facility in Spokane, Washington, and planned to keep it there until spring.

On December 19, 2013, the motorhome was burglarized. The dashboard was severely damaged when the intruders removed electrical components. The Harmons immediately filed a claim with State Farm. State Farm acknowledged receipt of the claim on December 22, 2013, and assigned a Claim Associate to handle the claim. The insurance policy at issue provided comprehensive coverage for the motorhome subject to a $500 deductible.

Following the loss, the Harmons obtained a written repair estimate from the facility where the motorhome had been stored. The repair estimate which was dated January 21, 2014, contained two separate estimates. The first estimate totaled over $184,000 and included $155,000 for the custom molding of a new dash because the old dash could not be repaired and a replacement could not be found. The second estimate was titled "Estimate with Figures Available." This estimate totaled $18,491.36 and included $2,000 for replacement of the dash, even though a replacement unit could not be located.

In January 2014, the Harmons were in touch with a State Farm claim representative via telephone. Mr. Harmon stated in his affidavit in opposition to summary judgment that "[the claim representative] informed us that State Farm would be totaling the coach because the dash could not be repaired, that no existing replacement was available, and that the dash could only be re-manufactured for a cost of approximately $155,000.00." State Farm did not dispute these statements.

Sometime in April or May 2014, Mr. Harmon spoke again with the State Farm claim representative via telephone. Mr. Harmon stated in his affidavit that the Claim Representative informed him at that time that State Farm did not consider the motorhome a total loss and that State Farm would pay the repair cost based on an estimate of the cost if a dash were actually available. On May 29, 2014, the claim representative sent Mr. Harmon a letter confirming their conversation and offering to pay $18,491.36 for the damage to the motorhome. The letter stated in part:

> The issue has been to get a replacement dash, to be able to complete the repairs to your motorhome. After much research by RV Northwest, *it appears there is not a replacement dash available, new or used*. I have spoke [sic] with several RV repair facilities myself. *If a dash was available I was told the price would be in the $2,000.00 range. I have taken the parts prices, labor prices, etc from the RV Northwest estimate and added $2,000.00 for a dash*. These figures

2

total up to, [sic] $18,491.36. I can write you a check for this amount. If there is any additional parts needed, additional labor, or parts increases, we will review them and handle it as a supplement.

Your motorhome is not a total loss because of an obsolete part, or because a company goes out of business and parts are no longer available. ***I am obligated to pay for what the part would cost if it was available.*** In this case the estimate for a replacement dash was $2,000.00.

If you have any additional information, or any questions, please give me a call. I am willing to look at any prospects with the idea of getting your motorhome back to the way it was prior to this incident. Thanks for your cooperation.

(Emphasis added).

Approximately three weeks after receiving this letter, the Harmons filed suit against State Farm alleging breach of contract and bad faith. On July 21, 2014, State Farm filed an answer and moved to stay the proceedings and compel an appraisal process that is required when there is a disagreement between the parties as to the cost of the repair or the actual cash value. It is undisputed that State Farm again offered to pay the Harmons what it estimated to be the actual cash value of the motorhome while the motion to stay proceedings was pending. The Harmons rejected the offer. On August 22, 2014, the parties stipulated to entry of the stay and to participate in the appraisal process. Thereafter, the parties traded letters concerning what would be determined by the appraisers. The Harmons demanded that the appraisers determine the actual cash value of the vehicle. State Farm, on the other hand, demanded the appraisal of both the cost of repair and the actual cash value.

On October 27, 2014, the claim representative sent the Harmons a letter advising them of new repair options. A used replacement dash from the previous model year had been located. The used dash would fit the space in the Harmon's motorhome, but was not an exact match. State Farm also advised the Harmons that another repair specialist had determined that their existing dash could be repaired. The claim representative enclosed two estimates, one for replacing the dash for $18,994.22 and the other for repairing the dash for $18,252.89, both of which would be subject to the $500 deductible. State Farm requested that the Harmons choose between either replacing the damaged dash or repairing it. The Harmons advised State Farm a few days later that they wanted to discuss the feasibility of repairs with their expert.

On November 10, 2014, the Harmons advised State Farm that they chose to have the dash repaired. On November 21, 2014, State Farm paid the Harmons $17,752.89—the amount of the

repair estimate less the $500 deductible. On January 30, 2015, the umpire involved in the appraisal process, issued a decision finding that the cost of repair was $18,252.89—the amount State Farm had tendered previously less the $500 deductible.

After State Farm tendered payment, the parties again traded letters regarding the repairs. In February 2015, the Harmons advised State Farm that they would have the repairs made subject to their right to reject if the repairs were not satisfactory. The Harmons also asked for a determination of the actual cash value of the vehicle from the umpire so that it could be used in the event the repairs were not successful. In May 2015, State Farm filed a motion to lift the stay of proceedings, arguing that the cash value of the motorhome was moot and, alternatively, that the Harmons refused to complete the appraisal process. The Harmons stipulated to lift the stay. The litigation then proceeded.

State Farm filed a motion for a summary judgment in June 2015. The Harmons responded to the motion. In August of 2015, the district court granted State Farm's motion for summary judgment, finding no breach of contract or bad faith. The district court dismissed the Harmons' claims and final judgment was entered. In September 2015, the Harmons timely filed a Motion to Alter or Amend the Judgment pursuant to Idaho Rule of Civil Procedure 59. The Order Denying Plaintiff's Motion to Alter or Amend the Judgment was filed in October 2015. The Harmons timely filed their Notice of Appeal in November 2015.

## II.  ISSUES PRESENTED ON APPEAL

1.      Whether the district court erred when it determined that State Farm had not breached the insurance contract.

2.      Whether the district court erred when it dismissed the Harmons' bad faith claim.

3.      Whether the Harmons are entitled to an award of reasonable attorney's fees and costs on appeal.

## III. STANDARD OF REVIEW

Idaho appellate standards of review apply even when a contract's choice of law provision requires the application of the law of another state. *See Carroll v. MBNA Am. Bank*, 148 Idaho 261, 264, 220 P.3d 1080, 1083 (2009) (applying the Idaho standard of review when a Delaware choice of law was at issue). In reviewing a grant of summary judgment, this Court's standard of review is the same as the district court's standard in ruling upon a motion. *Thomson v. Lewiston*, 137 Idaho 473, 475–76, 58 P.3d 488, 490–91 (2002). "The [district] court must grant summary

4

judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." I.R.C.P. 56(a). Courts will consider "pleadings, depositions, and admissions on file, together with the affidavits, if any." *Kiebert v. Goss*, 144 Idaho 225, 227, 159 P.3d 862, 864 (2007) (internal citations omitted). In making that determination, all facts are construed in the light most favorable to the non-moving party and all reasonable inferences that can be drawn from the record are to be drawn in favor of the non-moving party. *Parks v. Safeco Ins. Co. of Illinois*, 160 Idaho 556, 561, 376 P.3d 760, 765 (2016). If there is no genuine issue of material fact, only a question of law remains, over which this Court exercises free review. *Kiebert*, 144 Idaho at 227, 159 P.3d at 864.

## IV. ANALYSIS

### A. Alaska law governs the parties' dispute.

State Farm insured the motorhome under Alaska Policy Form 9802A. There is a choice of law provision in the policy which states: "Without regard to choice of law rules, the law of the state of: Alaska will control . . . in the event of any disagreement as to the interpretation and application of any provision in this policy." This Court has previously ruled that the law of the state chosen by the parties to govern their contractual rights and duties will be applied. *See Ward v. Puregro Co.*, 128 Idaho 366, 369, 913 P.2d 582, 585 (1996) (quoting Restatement (Second) of Conflict of Laws § 187). The parties do not contest the application of Alaska law.

It should be noted that, ordinarily, the reasonable expectations doctrine would not be applicable to this case, except for the parties' choice of law provision. It is not the law in Idaho. This Court has held:

> In declining to adopt the doctrine of reasonable expectations in Idaho, we follow the rationale of the dissenting opinion in *Corgatelli*. There, Justice Donaldson rejected an adoption of the doctrine of reasonable expectations and relied upon the traditional basic principles involved in construing contracts. Intent is to be determined from the language of the contract itself[] and in the absence of ambiguity, contracts for insurance must be construed as any other and understood in their plain, ordinary and proper sense, according to the meaning derived from the plain wording of the contract.

*Casey v. Highlands Ins. Co.*, 100 Idaho 505, 509, 600 P.2d 1387, 1391 (1979) (footnote omitted).

### B. The district court erred when it determined that State Farm did not breach the insurance agreement.

The district court found that State Farm did not breach the insurance agreement. The district court held that the policy required State Farm to pay the amount as determined by a bid

or repair estimate that the company approves. The district court reasoned that State Farm approved the RVs Northwest estimate dated January 21, 2014, in the amount of $18,491.36 and offered to pay this amount to the Harmons. The district court erred in its analysis of the policy.

In Alaska, the interpretation of an insurance contract is a question of law that is reviewed de novo. *Devine v. Great Divide Ins. Co.*, 350 P.3d 782, 786 (Alaska 2015). "Thus, 'the liability of an insurer and the extent of the loss under a policy of liability or indemnity insurance must be determined, measured, and limited by the terms of the contract.'" *Guin v. Ha*, 591 P.2d 1281, 1285 (Alaska 1979) (quoting 15 G. Couch, Cyclopedia of Insurance Law § 56:1 (2d ed. 1966)). "The purpose of contract interpretation is to ascertain and effectuate the reasonable expectations of the parties." *Stordahl v. Gov't Emp. Ins. Co.*, 564 P.2d 63, 65 (Alaska 1977). The Alaska Supreme Court has explained:

> Interpretation of an insurance contract is a question of law that we review de novo, looking "to the language of the disputed policy provision, other provisions of the policy, and relevant extrinsic evidence." "[B]ecause of inequities in bargaining power, we construe coverage broadly and exclusions narrowly, in favor of insureds." ***Insurance contracts are construed using the reasonable expectations doctrine, under which the "objectively reasonable expectations" of an insurance applicant about the terms of the insurance contract will be honored "even though painstaking study of the policy provisions would have negated those expectations."*** "To determine the parties' reasonable expectations, we examine (1) the language of the disputed policy provisions; (2) the language of other provisions in the same policy; (3) extrinsic evidence; and (4) case law interpreting similar provisions."

*Devine*, 350 P.3d at 786 (footnotes omitted and emphasis added).

It is important to begin the analysis of State Farm's obligations with the language of the insuring agreement in the comprehensive coverage portion of the policy. The policy stated: "***We*** will pay for ***loss***, except ***loss caused by collision***, to a ***covered vehicle.***" The policy defined the term "loss" as:

> 1. direct, sudden, and accidental damage to; or
> 2. total or partial theft of a ***covered vehicle***. Loss does not include any reduction in the value of any ***covered vehicle*** after it has been repaired, as compared to its value before it was damaged.

The policy had a "loss settlement" provision which stated:

> 1. ***We*** have the right to choose to settle with ***you*** or the owner of the ***covered vehicle*** in one of the following ways:
>    a. Pay the cost to repair the ***covered vehicle*** minus any applicable deductible.

6

(1) *We* have the right to choose to settle with you or the owner of the *covered vehicle* in one of the following ways:

(a) The cost agreed to by both the owner of the covered vehicle and *us*;

(b) A bid or repair estimate approved by *us*; or

(c) A repair estimate that is written based upon or adjusted to:

    (i) the prevailing competitive price;

    (ii) the paintless dent repair price that is competitive in the market; or

    (iii) a combination of (i) and (ii) above.

The prevailing competitive price means prices charged by a majority of the repair market in the area where the *covered vehicle* is to be repaired as determined by a survey made by *us*. If asked, *we* will identify some facilities that will perform the repairs at the prevailing competitive price. The estimate will include parts sufficient to restore the *covered vehicle* to its pre-loss condition.

. . . .

b. Pay the actual cash value of the *covered vehicle* minus any applicable deduction.

. . . .

The Harmons sustained a loss to their motorhome in the form of a partial theft. The issue to be determined is how to measure that loss. State Farm takes the position that the policy gave the insurer the sole discretion to determine how to pay the claim. State Farm argues that it had the choice to either: (a) pay the cost to repair the motorhome minus the deductible; or (b) pay the actual cash value of the motorhome. The company argues that since it has now paid the cost to repair the motorhome there was no breach of contract. State Farm's argument is unavailing.

It is undisputed that a State Farm claim representative initially told the Harmons that the company would pay the actual cash value for the motorhome because the dash could not be repaired or replaced. Later the Harmons received a phone call from the same adjuster reversing course. Instead of paying the actual cash value of the vehicle, State Farm would pay the Harmons the cost to repair the vehicle even though the parties agreed that it could not be repaired and a replacement dash did not exist. On May 29, 2014, more than five months after the loss, State Farm sent the Harmons a written settlement offer confirming their conversation and stating:

The issue has been to get a replacement dash, to be able to complete the repairs to your motorhome. After much research by RV Northwest, *it appears there is not a replacement dash available, new or used*. I have spoke [sic] with several RV repair facilities myself. If a dash was available I was told the price

7

would be in the $2,000.00 range. I have taken the parts prices, labor prices, etc from the RV Northwest estimate and added $2,000.00 for a dash. These figures total up to, [sic] $18,491.36. I can write you a check for this amount. If there is any additional parts needed, additional labor, or parts increases, we will review them and handle it as a supplement.

The letter continues: "Your motorhome is not a total loss because of an obsolete part, or because a company goes out of business and parts are no longer available. ***I am obligated to pay for what the part would cost if it was available.*** In this case the estimate for a replacement dash was $2,000.00." (Emphasis added).

The insurance agreement gave State Farm the option to "[p]ay the cost to repair the ***covered vehicle*** minus any applicable deductible" or to "[p]ay the actual cash value of the ***covered vehicle*** minus any applicable deduction." "The words 'repair' and 'replace' mean restoration to a condition substantially the same as that existing before the damage was sustained." *Great Texas Cnty. Mut. Ins. Co. v. Lewis*, 979 S.W.2d 72, 74 (Tex. App. 1998), *accord Repair*, Dictionary.com, http://www.dictionary.com/browse/repair (last visited Feb. 21, 2017) (stating the word "repair" means "to restore to a good or sound condition after decay or damage; mend: to repair a motor"). The cost of making a hypothetical repair is not the cost of restoring the motorhome to substantially the same condition as before the damage was sustained. There is nothing in the policy stating that if a necessary part is no longer available, then State Farm only needs to pay the amount that a repair would cost had the necessary replacement part existed. By making that assertion, State Farm misrepresented the terms of the policy to its insured in order to lessen the amount that it would pay for the loss.

The district court found that the only option the Harmons had after receiving the May 29, 2014 settlement offer was to initiate an appraisal process set forth in the policy. The appraisal provision states in relevant part: "If the owner of the ***covered vehicle*** or ***you*** fail to agree with us on the cost to repair the ***covered vehicle*** or the actual cash value of the ***covered vehicle***, it shall be decided by an appraisal upon written demand by the owner of the ***covered vehicle***, ***you***, or ***us***." We disagree with the district court's interpretation of the appraisal process requirement. The Harmons filed suit approximately three weeks after receiving State Farm's May 29, 2014 settlement offer. At that point in time the parties had a dispute over State Farm's interpretation of the policy, not the cost of the repair. This means that the appraisal process was not actually required, and the Harmons' decision to file suit was not unreasonable.

The case continued and proceeded through the appraisal process. During the process, the parties discovered that the dash could be repaired. State Farm paid $18,252.90 to the Harmons before the appraisal umpire issued his decision. The umpire decided that the cost to repair all damages was in fact $18,252.90, less the $500 deductible. At this point, State Farm has satisfied its contractual monetary obligation to the Harmons by paying for the cost of repair. The dissent argues that this late payment is a mere delay in the loss settlement negotiations, and it releases State Farm from the original breach. We do not agree.

While State Farm has satisfied its obligation to pay for the loss to the motorhome, a breach of contract still occurred and may be the basis of a claim for bad faith. State Farm's eventual payment of the contractual obligation cannot erase the original breach which prompted the filing of this lawsuit. The district court erred when it held that State Farm did not breach the insurance agreement. We hold that State Farm breached the agreement when it failed to pay the actual cash value of the motorhome on May 29, 2014.

**C.    The district court erred when it dismissed the Harmons' bad faith claim based on its erroneous conclusion that State Farm had not breached the insurance agreement.**

The district court dismissed the Harmon's bad faith claim on summary judgment based upon the erroneous legal conclusion that State Farm had not breached the insurance agreement. However, as stated above, this Court finds that State Farm did, in fact, breach the insurance agreement. Therefore, the bad faith claim must be substantively reviewed.

Alaska has adopted the independent tort of bad faith in first-party cases and has used the accompanying objective standard from the well-known *Anderson* case:

> The tort of bad faith can be alleged only if the facts pleaded would, on the basis of an objective standard, show the absence of a reasonable basis for denying the claim, i.e., would a reasonable insurer under the circumstances have denied or delayed payment of the claim under the facts and circumstances.

*Hillman v. Nationwide Mut. Fire Ins. Co.*, 855 P.2d 1321, 1323–24 (Alaska 1993) (quoting *Anderson v. Cont'l Ins. Co.*, 271 N.W.2d 368, 376–77 (Wis. 1978)). To prove bad faith in Alaska, a plaintiff must establish "the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *Hillman*, 855 P.2d at 1324 (quoting *Anderson*, 271 N.W.2d at 376–77). But "an insurance company may still challenge claims which are fairly debatable." *Hillman*, 855 P.2d at 1324 (quoting *Noble v. Nat'l Am. Life Ins. Co.*, 624 P.2d 866, 868 (Ariz. 1981)). The Alaska Supreme Court has looked to and quoted Idaho bad faith law, including the seminal case of

*White v. Unigard Mutual Ins. Co.*, 112 Idaho 94, 730 P.2d 1014 (1986). *See State Farm Fire & Cas. Co. v. Nicholson*, 777 P.2d 1152, 1156 (Alaska 1989) (*citing Unigard*, 112 Idaho at 97–98, 730 P.2d at 1017–18).

In order for a first-party insured to recover on a bad faith claim, the insured must show: "1) the insurer intentionally and unreasonably denied or withheld payment; 2) the claim was not fairly debatable; 3) the denial or failure to pay was not the result of a good faith mistake; and 4) the resulting harm is not fully compensable by contract damages." *Parks v. Safeco Ins. Co. of Illinois*, 160 Idaho 556, 562, 376 P.3d 760, 766 (2016) (quoting *Robinson v. State Farm Mut. Auto. Ins. Co.*, 137 Idaho 173, 176, 45 P.3d 829, 832 (2002)). "Although the tort of bad faith is not a breach of contract claim, to find that the insurer committed bad faith there must also have been a duty under the contract that was breached." *Id*.

"In *Unigard*, this Court held that a party claiming extra-contractual damages for insurance bad faith must either prove that the insurer has 'intentionally and unreasonably' denied or delayed payment, provided the other elements are met." *Weinstein v. Prudential Prop. and Cas. Inc. Co.*, 149 Idaho 299, 348, 233 P.3d 1221, 1270 (2010) (citing *Unigard*, 112 Idaho at 100, 730 P.2d at 1020). "[T]his Court extended liability for insurance bad-faith to negligent delays or denials of insurance." *Id*. (*citing Reynolds v. Am. Hardware Mut. Ins. Co.*, 115 Idaho 362, 365, 766 P.2d 1243, 1246 (1988)).

In the present case, we hold that a duty under the contract was breached when State Farm refused to pay the actual cash value of the motorhome on May 29, 2014. Payment does not cure the breach and does not erase bad faith at the time of the breach. The question before the district court is whether State Farm acted in bad faith and whether the Harmons suffered any extra-contractual damages. The dissent contends that the Harmons' claim is nothing but an attempt to squeeze money out of State Farm. The Harmons' bad faith claim was dismissed on summary judgment without any analysis of whether the Harmons sustained any extra-contractual damages. The district court or a jury will have to resolve whether the Harmons are entitled to any additional compensation.

Turning to the final issue, a party will only be awarded attorney's fees if it prevails on the claim. *Tobeluk v. Lind*, 589 P.2d 873, 877–78 (Alaska 1979); *see also Eighteen Mile Ranch, LLC v. Nord Excavating & Paving, Inc.*, 141 Idaho 716, 718–19, 117 P.3d 130, 132–33 (2005). At this time, the case is remanded for further proceedings on the bad faith claim. It is not

appropriate to decide attorney's fees prematurely. *See Estate of Holland v. Metro. Prop. and Cas. Ins. Co.*, 153 Idaho 94, 101, 279 P.3d 80, 87 (2012) (explaining that the district court must make preliminary determinations on the merits before determining attorney's fees). Attorney's fees shall be determined by the district court upon remand.

## V. CONCLUSION

We reverse the decision of the district court and remand this case for further proceedings with regard to the bad faith claim, as well as attorney's fees. Costs to Appellant.


Chief Justice BURDICK, and Justices EISMANN and HORTON CONCUR.


JONES, J. dissenting:

I respectfully dissent from the majority's holding that State Farm breached the policy when it offered to pay the cost to repair the vehicle on May 29, 2014. The Harmons disagreed with the amount State Farm offered to repair the vehicle, but instead of submitting the issue to the appraisal process, per the terms of the policy, they sued State Farm. Eventually, the appraisal process was initiated and the dispute was settled, albeit after the unnecessary delay caused by the Harmons' lawsuit.

It is important to contextualize this appeal. The Harmons' insurance claim has been settled. They accepted $18,252.90, less the $500 deductible, as the cost of repair. Indeed, the majority admits that "State Farm has satisfied its contractual monetary obligation to the Harmons by paying for the cost of repair." The Harmons cannot, at this point, reasonably argue that they are entitled to the actual cash value of the vehicle because they have already sold the vehicle.[1] This frivolous appeal is merely an attempt by the Harmons to squeeze State Farm for more money.

Unsurprisingly, the majority's recitation of the facts is tailored to support its erroneous conclusion. Consequently, I feel obligated to recount the facts in an evenhanded manner. On December 22, 2013, State Farm received the Harmons' initial claim. On January 21, 2014, the Harmons submitted two drastically different repair estimates, one for over $184,000 and the other for $18,491.36. Within the month, State Farm responded that it would consider the vehicle

---

[1] The policy provides that if State Farm were to pay the Harmons the actual cash value of the vehicle, "The damaged **covered vehicle** must be given to [State Farm] in exchange for [State Farm's] payment . . . ." (Emphasis in original).

11

totaled; however, a few months later, State Farm indicated that it would pay the $18,491.36 estimate previously submitted by the Harmons. Three weeks later, the Harmons ended the cordial loss settlement negotiation process by initiating the underlying lawsuit. On July 21, 2014, State Farm filed an answer and a motion to stay the proceedings in order to initiate the appraisal process, as required by the policy. On August 12, 2014, the Harmons filed an objection to State Farm's motion to stay. That same day, State Farm offered to pay the Harmons the actual cash value of the vehicle; essentially offering the Harmons an opportunity to end the controversy. The Harmons rejected State Farm's offer. On August 22, 2014, the parties stipulated to stay the proceedings and begin the appraisal process. The parties exchanged letters and agreed on the scope of the appraisal. On October 27, 2014, State Farm sent the Harmons a letter with two appraisals, one to repair the existing dash, and the other to replace the existing dash with a newly discovered part. On October 30, 2014, the Harmons acknowledged the receipt of State Farm's letter, but did not indicate that they had decided as to how they would proceed. Finally, on November 10, 2014, the Harmons decided to have the dash repaired. State Farm tendered payment eleven days later.

Under the plain language of the insurance policy, State Farm had the choice to either repair the vehicle or pay the actual cash value of the vehicle.

1. *We* have the right to choose to settle with *you* or the owner of the *covered vehicle* in one of the following ways:
   a. Pay the cost to repair the *covered vehicle* minus any applicable deductible.
      (1) *We* have the right to choose one of the following to determine the cost to repair the *covered vehicle:*
         (a) The cost agreed to by both the owner of the *covered vehicle* and *us*;
         (b) A bid or repair estimate approved by *us*; or
         (c) A repair estimate that is written based upon or adjusted to:
            (i)   The prevailing competitive price;
            (ii)  The paintless dent repair price that is competitive in the market; or
            (iii) A combination of (i) and (ii) above.

   . . .

   b. Pay the actual cash value of the *covered vehicle* minus any applicable deductible. The damaged *covered vehicle* must be given to *us* in exchange for *our* payment, unless *we* agree that the owner may keep it. If the owner keeps the *covered vehicle*, then *our* payment will be reduced by the value of the *covered vehicle* after the *loss*; or

   . . .

12

> If the owner of the ***covered vehicle*** or ***you*** fail to agree with ***us*** on the cost to repair the ***covered vehicle*** or the actual cash value of the ***covered vehicle***, it shall be decided by an appraisal upon written demand by the owner of the ***covered vehicle***, ***you***, or ***us***.

(Emphasis in original).

State Farm's May 29, 2014 offer complied with subsection (1)(b) of the policy. As the foregoing demonstrates, if State Farm chose to repair the vehicle, it could do so by, *inter alia*, paying a bid or repair estimate approved by only State Farm. The estimate submitted by the Harmons provided a cost of repair of $18,491.36, which is precisely the amount State Farm offered in its May 29, 2014 letter. Per the terms of the policy, if the Harmons disagreed with the amount of the offer, they were required to submit the issue to the appraisal process. The Harmons ignored the policy and filed the underlying lawsuit.

As an aside, I disagree with the majority's conclusion that the appraisal process was not required. The majority posits that the appraisal process was not triggered by State Farm's May 29, 2014 offer because "At that point in time the parties had a dispute over State Farm's interpretation of the policy, not the cost of repair." This is plainly incorrect because the policy allows State Farm to make an offer to repair based on an approved estimate, which is what State Farm did in its May 29, 2014 letter. The Harmons did not disagree with State Farm's interpretation of the policy, *i.e.*, the fact that State Farm made an offer to repair the vehicle; rather, the Harmons disagreed with the amount State Farm offered to repair the vehicle. This is precisely the situation that the appraisal process was designed to address: "If the owner of the ***covered vehicle*** or ***you*** fail to agree with ***us*** on the cost to repair . . . it shall be decided by an appraisal . . . ." (Emphasis in original). Surely, the majority's conclusion that the appraisal process was not required is an attempt to rationalize the Harmons' unreasonable lawsuit.

The majority concludes that on May 29, 2014, State Farm breached the policy by unreasonably offering $18,491.36 instead of the actual cash value of the vehicle. I am baffled by this conclusion for two reasons. First, the policy clearly states that State Farm may repair the vehicle by paying a repair estimate approved by only State Farm. State Farm complied with the policy by offering to pay $18,491.36 to repair the vehicle. Second, the majority's conclusion that State Farm breached the policy by failing to offer the actual cash value of the vehicle is plainly incompatible with its acknowledgement that "[i]t is undisputed that State Farm again offered to pay the Harmons what it estimated to be the actual cash value of the motorhome while the

13

motion to stay proceedings was pending." I concede that State Farm offered the Harmons the actual cash value of the vehicle late in the process, but both parties caused delays and the policy does not impose specific time constraints. Moreover, delays should be expected in loss settlement negotiations; especially in this case given that the replacement dash was no longer manufactured. Nonetheless, the majority takes issue with State Farm's delay, but overlooks similar delays by the Harmons.

A possible explanation for the majority's erroneous conclusion is that it interpreted Alaska's reasonable expectations doctrine as a license to disregard the plain language of the policy and rule in favor of the sympathetic insureds. As mentioned by the majority, Alaska's reasonable expectations doctrine instructs us to honor the Harmons' "objectively reasonable expectations . . . even though painstaking study of the policy would negate those expectations." *Devine v. Great Divide Ins. Co.*, 350 P.3d 782, 786 (Alaska 2015) *reh'g denied*, 350 P.3d 782 (Alaska 2015). The majority emphasized the foregoing, and seemingly glanced over the subsequent instruction, which provides: "To determine the parties' reasonable expectations, we examine **(1) the language of the disputed policy provisions;** (2) the language of other provisions in the same policy; (3) extrinsic evidence; and (4) case law interpreting similar provisions." *Id.* (Emphasis added). The language of the policy cannot simply be disregarded. Indeed, in two cases cited by the majority, the Alaska Supreme Court analyzed the language of the respective policies and ruled in favor of each insurance company, despite the alleged expectations of each insured. *See*, *Devine*, 350 P.3d 782 (Alaska 2015); *Stordahl v. Government Emp. Ins. Co.*, 564 P.2d 63 (Alaska 1977). Here, the policy's language is simple and straightforward: State Farm may repair the vehicle by paying "[a] bid or repair estimate approved by [State Farm]." No painstaking study is necessary to understand State Farm's responsibility, nor is a painstaking analysis necessary to conclude that State Farm fulfilled its responsibility.

The bottom line is that State Farm's May 29, 2014 letter did not amount to a breach of the policy; rather, it was a loss settlement offer in response to two drastically different repair estimates submitted by the Harmons. Based on my experience, which includes over thirty years of practicing insurance law, insureds and insurers generally exchange a series of demands and offers in loss settlement negotiations. State Farm's May 29, 2014 offer complied with the policy, but understandably, the Harmons expected more. The appropriate response by the Harmons would have been to make a counter offer, or refuse State Farm's offer and initiate the appraisal

process. Indeed, the appraisal process led to the eventual settlement, which could have been reached sooner, but for the Harmons' eagerness to file the underlying lawsuit.